[No. A113370. First Dist., Div. Four. Aug. 17, 2007.]

In re ALFRED WILLIAM RODERICK on Habeas Corpus.

 

COUNSEL

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson and Mary Jo Graves, Chief Assistant Attorneys General, Julie L. Garland, Assistant Attorney General, Anya M. Binsacca, Jennifer A. Neill and Jessica N. Blonien, Deputy Attorneys General, for Appellant State of California.

Michael Satris and Margaret Littlefield, under appointments by the Court of Appeal, for Respondent Alfred William Roderick.

OPINION

**RIVERA, J.**—The Attorney General appeals from a superior court order granting a petition for writ of habeas corpus filed by Alfred William Roderick, who is now 75 years old. The superior court determined that the factors relied upon by the panel of hearing officers representing the Board of Parole Hearings in denying Roderick parole were not supported by some evidence.[1] The court granted Roderick's petition and referred the matter back to the Board for further review consistent with the court's ruling. The Attorney General urges us to reverse the court's decision, arguing that there is some evidence in the record to support each of the factors upon which the Panel relied in denying Roderick parole. We affirm.

## I. FACTUAL BACKGROUND

### A. *The Commitment Offense*

On April 11, 1986, Roderick was convicted of one count of second degree murder with the use of a deadly weapon and sentenced to 16 years to life in prison. The murder occurred when Roderick stabbed another man, Michael Obie, outside of a saloon in Eureka. According to police reports, as summarized in the probation officer's report, Roderick and Obie began arguing inside the bar and Roderick challenged him to go outside and fight. Roderick reportedly punched Obie as they were going out the door, and then hit him again as Obie exited the saloon.[2] The altercation continued outside and a few seconds later "it was reported that [Obie] had been stabbed."

---

[1] We will refer to Roderick's panel of hearing officers as the Panel and the Board of Parole Hearings (formerly the Board of Prison Terms (see Gov. Code, § 12838.4; Pen. Code, § 5075)) as the Board.

[2] Roderick has consistently maintained that it was Obie who started the fight as they left the bar.

The record before us also discloses the following additional facts: Obie began harassing Roderick inside the bar when he ascertained that Roderick was the father of a security guard at Safeway who had arrested Obie's aunt for shoplifting. During the fight that took place outside the saloon, Obie pulled a hunting knife, the two struggled over the knife, and, ultimately, Roderick gained control of the knife and stabbed Obie in the chest. Roderick was drunk at the time of the crime. Obie was on parole for first degree murder.

## B. *History of Parole Hearings*

### 1. *1994*

Roderick's minimum eligible parole date was August 28, 1995. Accordingly, his initial parole hearing took place in 1994. In the life prisoner evaluation report prepared for that hearing, Roderick's behavior in prison is described as "marginal," with an "average" relationship with staff and other inmates. The report also sets forth a disciplinary history which indicates he had a CDC 115[3] for possessing marijuana in 1993, and that he was stabbed during an altercation with his cellmate in 1989. Roderick was assessed to pose a "moderate" threat to the public if released. A psychiatric evaluation prepared in 1994 states that Roderick "demonstrates little self-understanding about the causative factors regarding [the commitment] offense or his previous offenses." Roderick was diagnosed with "[a]lcohol intoxication" and an "[a]ntisocial personality disorder," which "reflects a lifestyle of repetitive crime compounded by substance abuse." The report states that "[i]n a less controlled setting, he would be less dangerous if he maintains his sobriety, but that can not be predicted nor guaranteed." No psychiatric treatment was indicated.

The Panel found Roderick would pose an unreasonable risk of danger to society if released, and denied parole, articulating the following reasons: (1) The commitment offense "was carried out in a manner which exhibits a callous disregard for the life and suffering of another"; (2) Roderick failed to develop a marketable skill; (3) Roderick failed to demonstrate evidence of positive change; he received a recent CDC 115 for possession of a controlled substance; and (4) the psychological report was "not totally supportive of release." One commissioner commented that Roderick appeared to have a

---

[3] A "CDC 115" refers to a rules violation report which documents misconduct that is "believed to be a violation of law or [that] is not minor in nature." (Cal. Code Regs., tit. 15, § 3312, subd. (a)(3).)

"very nonchalant, indifferent attitude about [his] whole situation, about [his] life history and the crime." Another commissioner stated: "I'm really puzzled by the solution as to what [Roderick] can . . . do to keep [himself] out of prison, which I don't think [he] really cares much about in or out of prison." Roderick responded that, for sure, that's one thing he would be doing.

### 2. *1997*

Roderick's next parole hearing occurred in 1997. The life prisoner evaluation report added nothing new from the previous report except to state that Roderick's degree of threat (moderate) was "based upon the consumption of alcohol in the instant [commitment] offense." The psychological evaluation, however, reflected a fundamental shift in attitude. In describing the crime Roderick "expressed his regret" and "wished he had handled [the situation] somehow differently." It reports that Roderick is attending Alcoholics Anonymous (AA) and that he is " 'done with drinking forever.' " Roderick is described as having normal intellectual functioning with good insight and judgment. Although still diagnosed with antisocial personality disorder, it is described as "improved." The report concludes that Roderick is showing improvement in his behavior and, if released, should be able to maintain the gains he has made, especially if he continues to abstain from alcohol. According to the report, his level of dangerousness "is likely to be less now than for the average inmate."

The Panel again found Roderick to pose an unreasonable risk to the public if released, based upon the following stated reasons: The commitment offense was callous; he had an unstable social history, including a history of predatory offenses; he had failed at previous grants of probation and parole and had prior prison terms; he had not upgraded educationally or vocationally; he had not participated sufficiently in self-help and therapy; and he was diagnosed with an antisocial personality disorder, "but he's improved." Commending Roderick for his excellent disciplinary record and for recent gains, the Panel noted the need for additional participation in AA and other self-help and therapy programming, for upgrading his vocational skills or education, and for remaining disciplinary free.

### 3. *1999*

Roderick was given another hearing in 1999. Salient in the life prisoner evaluation report prepared for that hearing is information concerning Roderick's criminal history—some 28 convictions over a period of 28 years,

ranging from negligent driving to armed robbery. Roughly half of the convictions relate to Vehicle Code violations, public drunkenness or contempt; the remaining crimes are primarily theft related, including petty and grand theft, forgery, burglary and armed robbery. Roderick's previous violent offenses occurred in 1959 (assault with a deadly weapon), and in 1970 (armed robbery). The report also notes that Roderick had another CDC 115 (work performance/obey orders) which he incurred when first incarcerated in 1986. In other respects the evaluation is, in essence, the same as the previous evaluations and assesses Roderick to be a "moderate degree of threat to the public if released." His psychological evaluation, however, reflects steady gains. According to the report, Roderick now understands that at the time of the crime he should not have been drinking, that had he been sober he could have made a better decision, and that the decision he made was irresponsible. The report states that Roderick is "very remorseful" for causing the victim's family grief, as well as for taking this time from his own family. The psychologist concludes, "after 14 years of incarceration, and 67 years of age, [I believe this inmate] has developed his maturity to such an extent that he would be an excellent candidate at this time for parole. [¶] . . . [¶] . . . If released to the community this inmate poses no more danger than the average citizen."

The Panel again denied parole, listing the following reasons to support its conclusion that Roderick posed an unreasonable risk of danger: The commitment offense was carried out in an especially cruel and callous manner and the motive for the crime was trivial in relation to the offense; Roderick had a record of violence and assaultive behavior and an escalating pattern of criminal conduct, had failed previous grants of probation and parole, and therefore could not be counted upon to avoid criminality; Roderick had failed to develop a marketable skill, failed to upgrade educationally and vocationally, and had not sufficiently participated in beneficial self-help or therapy programs; and Roderick had a serious CDC 115 in 1993 for possession of marijuana. The Panel took note of the psychological evaluation which "states that [Roderick's] insight into his commitment offense is minimal [but] goes on to say some very positive things about [Roderick]."[4] The Panel commended Roderick for his excellent work evaluations, and his participation in AA and in the life skills program. It found, however, that Roderick "needs

---

[4] The psychological evaluation does state that Roderick's insight into the commitment offense is "minimal"; this statement is qualified, however, by the additional assessment that "his place of development within the structure of the offense is appropriate." The psychological evaluation then goes on to describe Roderick's understanding that his drinking is part of the problem, and that his behavior was irresponsible. Additionally, he is no longer diagnosed as having a personality disorder.

continued therapy in order to face, discuss, understand and cope with stress in a nondestructive manner." The Panel recommended that Roderick "remain disciplinary-free, upgrade vocationally and educationally and participate in continued self-help and therapies programs as they become available."

### 4. *2001*

Roderick's next hearing was in 2001. The life prisoner evaluation report—if there was one—is absent from the record. No new psychological report was prepared for this hearing; under a new protocol, the Panel was to rely on the 1999 evaluation. The Panel again declined to set a date for parole on the ground Roderick would pose an unreasonable risk of danger to public safety. This was based upon the following factors: The commitment offense was carried out in an especially cruel manner; Roderick had an extensive prior history of criminality, had served prior prison terms and thus had failed to profit from previous attempts to correct his criminality; Roderick had a problem with alcohol and "at some point" used marijuana as well; Roderick had not sufficiently participated in beneficial self-help programs; and Roderick's "counselor[]" believed he would pose a "moderate degree of threat to the public if released at this time." The Panel found, again, that Roderick "needs continued therapy in order to face, discuss, understand, and cope with stress in a nondestructive manner."

On the other hand, Roderick was commended for increasing his TABE score,[5] for receiving above average and exceptional work reviews, for participating in AA "for a number of years now," and for participating in a class on the subject of sexually transmitted diseases. The Panel gave Roderick his first one-year denial (a new hearing in one year instead of two) and recommended that he remain disciplinary free—to come back "completely clean"—and continue to participate in available self-help, meaning not just AA but anything else that was offered. Significantly, the following exchange then took place: "[Roderick]: I wrote a letter to this place over here and they wrote me a letter back saying they had no self-help (indiscernible), self-help (indiscernible) opening right now. [¶] [Commissioner]: Okay. Well, we're just telling you—[¶] [Roderick]: Yeah, I know that. [¶] [Commissioner]:—that if available—[¶] [Roderick]: I'm trying to do that. [¶] [Commissioner]:—if anything—[¶] [Roderick]: Right. [¶] [Commissioner]:—comes up. We know that programming is limited. We know that. [¶] [Roderick]: Okay. [¶]

---

[5] The TABE (tests of adult basic education) score reflects an inmate's educational achievement level. (Frequently Asked Questions about TABE: Tests of Adult Basic Education (2000) p. 2 <http://www.lacnyc.org/resources/adult/assess/tabefaq.pdf> [as of Aug. 17, 2007] (TABE FAQ's); see, *post*, p. 257, fn. 10.)

[Commissioner]: We understand that. That's why we're recommending you continue in AA and anything else that's available to you. [¶] [Roderick]: Okay."

Additionally, another commissioner made this comment: "Mr. Roderick, you're in—In my opinion and our opinion, you're on the right track. [¶] . . . [¶] And you're to be commended for having turned a number of corners, in our opinion. Continue on that right track."

The Panel's decision no longer included the recommendation which had been included in every previous denial that Roderick—then almost 70 years old—upgrade vocationally and educationally.

### 5. *2002*

For the 2002 hearing, the life prisoner evaluation report updated the 1999 report and added a summary of Roderick's work assignments and performance reviews, and of Roderick's therapy and self-help activities. One significant change was that Roderick's threat assessment was reduced to a "moderate to minimal degree of risk to the community if released." Pursuant to the new protocol, no new psychological evaluation was prepared for this hearing.

Although Roderick was not given a release date, the Panel again commended him for his progress. In denying parole, the Panel relied on essentially the same reasons as those given for his 2001 denial, and stated, again, that he needed "continued self-help and/or therapy programming in order to face, discuss, understand and cope . . . with stress in a non-destructive manner." On a positive note, the Panel observed that the most recent psychological evaluation (from 1999) stated that Roderick "was no more a danger than the average citizen," that Roderick's parole plans included offers of both a job and a home, that Roderick had no "115s" since 1993, that Roderick had satisfactory to above-average work reports, and that Roderick had participated in AA, in Project CHANGE, in life skills, and in a class on sexually transmitted diseases. "Next year," one commissioner stated, "we recommend, Mr. Roderick, that you remain disciplinary-free, that you continue to participate in any self-help and/or therapy programming that might become available to you, and that you cooperate with clinicians in the completion of a new clinical evaluation. When you come [back] to [the] Board, your psych[ological] eval[uation] will be four years old and we don't

want that to be held against you at the next Board appearance so we ask for a new psych eval to be completed. I don't think there will be any problems there. We just want to make sure that you have a fresh one on file. . . . [¶] . . . [¶] I want to wish you good luck. You've done some pretty good time here. I'm a little disappointed that you hadn't completed a vocation in this term or your prior terms, but you're to the age now where you're probably not going to really need to use that on the outside and probably would just be taking up space for somebody that would really need to learn a vocational skill. But just continue mainly in self-help areas and continue your positive programming. And I think that you're coming around the corner, moving in the right direction. And you've got some more time to do."

### 6. *2003*

The record contains no transcript of the Panel's decision in 2003. The record does, however, contain a psychological evaluation for the "November 2003 Lifer Calendar." The evaluation reports that Roderick "freely admitted to a former problem with alcohol and has dealt with this issue through membership and attendance at Alcoholics Anonymous meetings." The report goes on to state that Roderick spoke "openly about the circumstances of the instant offense, and his comments reflect a new sense of insight into his incarceration." According to the report, Roderick "is fully remorseful, and aware of the effect of his actions on the victim's family." The report agrees with the 1999 assessment that Roderick "would pose no more danger than the average citizen" and concludes that he has "an extremely low probability of recidivism."

There is also a life prisoner evaluation report for the "November 2003 Calendar." In that report, Roderick's threat assessment was reduced again, as the report concluded Roderick would pose "a minimal degree of risk to the community if released on parole at this time."

Apparently, a hearing was held in December of 2003, because in the life prisoner evaluation report prepared for the December 2004 calendar the following was noted: "On 12/18/03 Roderick attended Subsequent parole consideration hearing #6, [Board] denied parole for 1 year and made the following recommendations: (1) Remain disciplinary-free, (2) Participate in self-help programs and requested a new psychological evaluation."

### 7. *2005*

The next hearing—resulting in the parole denial we review here—was held in May 2005. As requested by the Panel, an updated psychological evaluation was prepared in April 2005. Primarily, it states there is no new information to

add to the 1999 report. The psychologist does note that Roderick "attended all of the self help groups available in the prison such as Anger Management and Alcoholics Anonymous," and that his release plans provide a "supportive environment, [in which] inmate Roderick's prognosis for success is excellent." There are no diagnosed mental or personality disorders, and Roderick is assigned a GAF rating of 90 to 95.[6] The report states that "[i]f released to the community inmate Roderick poses no more danger than the average citizen. [¶] . . . The only significant risk factor to violence would be inmate Roderick['s] using alcohol or drugs (which he stopped in 1991). He will be living in a very supportive benevolent environment and he is thoroughly convinced of alcohol's terrible effects. It is very unlikely he would be violent." The report concludes, "[g]iven everything inmate Roderick has learned, his age [73 years] and the fact that he has experienced a 'slowing down' during the last year, due to aging, he would make an excellent candidate for parole."

A life prisoner evaluation report was prepared for the "December 2004 Calendar," and we assume it was used for the May 2005 hearing. The report does not differ materially from the 2003 report (assessing Roderick as posing a "minimal" risk of reoffending), and states that the Panel had denied parole for one year in December 2003, that the Panel recommended Roderick remain disciplinary free and continue to participate in self-help programs, and that, in fact, Roderick remained disciplinary free and continued to participate in AA.

At the hearing, the Panel reviewed the circumstances of the commitment crime, relying on the probation report which summarized police reports. Roderick gave his account of the incident. Although the two accounts differed with respect to who initiated the physical fight, it is uncontradicted that the victim Obie began harassing Roderick inside the saloon, that it was Obie who pulled the knife during the fight outside the bar, that Roderick was drunk when the crime took place, and that Roderick was unaware he had inflicted a fatal wound at the time it occurred. Under questioning by Roderick's attorney, it was brought out that the victim was a larger and much younger man than Roderick.[7]

---

[6] "GAF" refers to global assessment of functioning. This is a clinician's judgment of the individual's overall level of functioning and ability to carry out activities of daily living, and is useful in planning treatment and in predicting outcomes. The GAF scale is a 100-point scale that measures a subject's overall level of psychological, social, and occupational functioning on a hypothetical continuum. A score of 91 to 100 means "Superior functioning in a wide range of activities, life's problems never seem to get out of hand, is sought out by others because of his or her many positive qualities. No symptoms." (<http://psyweb.com/Mdisord/DSM_IV/jsp/Axis_V.jsp> [as of Aug. 17, 2007].)

[7] The dissent states Roderick inflicted "multiple knife wounds," implying Roderick stabbed the victim multiple times. (Dis. opn., *post*, at pp. 290, 293.) The record, however, indicates that

The Panel then reviewed Roderick's extensive criminal record and asked him about it. Roderick acknowledged it, and stated he had "no excuse for it." The Panel also reviewed his family history: that his parents had been divorced before he was born, that Roderick was raised by his grandmother, that he did not see his mother until he was 16, that he did not have a relationship with his father, that he completed school through the 11th grade, that he was married for 20 years, that he has two daughters, that he is still close to his ex-wife, that he is in close contact with his daughters, that he has nine grandchildren and a great-grandchild on the way, and that prior to this incarceration he worked mostly as a "high climber."[8] When asked why, given that he had a family and a job, he had engaged in criminal behavior, he responded: "Stupid is all I can tell you." When a Panel member commented that Roderick just "[did]n't seem to know why [he was] doing it," Roderick admitted, "It don't make sense, I'll agree with you," but he admitted that he was drinking too much during that time and was an alcoholic. Roderick denied any drug habit.

The Panel then reviewed Roderick's parole plans. If released, Roderick would live with his daughter and son-in-law in Eureka. He would work with his son-in-law, who was a contract logger, and would also be receiving $850 per month income from Social Security. These plans were supported by a letter from Roderick's daughter describing where he would live and the loving environment the family would provide. Roderick also planned to attend AA meetings in Eureka.

The Panel also reviewed matters relating to Roderick's incarceration, noting a custody level of "Medium A."[9] The Panel recited that, as of August 2004, Roderick was assigned to the yard crew and had received an "exceptional" performance rating. Further, "[t]here was no psychiatric treatment and no negative discipline."

The Panel then asked what Roderick had been doing since August 2004. Roderick explained he had been reassigned from the yard crew to the canteen, but complained the inmates had been "locked up all the time over there" and had "only been out a few days this year." He stated he had attended AA "every time they got a chance to go" but that he had gone only about four times because "[w]e're locked up all the time over there." Roderick stated he had been in AA for 12 years. When asked what the eighth

the victim, when found, was bleeding from "chest wounds" which is consistent with Roderick's statement that in the course of the altercation he "cut" the victim on the chest, and later stabbed him.

[8] Roderick worked in the logging industry, specializing in topping redwoods.

[9] This is the least restrictive level of custody for a life-term prisoner. (Cal. Code Regs., tit. 15, § 3377.2, subds. (a)(16), (b)(3)(C).)

and ninth steps of the "12 steps" were, Roderick had difficulty responding, explaining that he was nervous. When prompted that it "deals with making amends" Roderick responded, "Yeah, making amends. Wait a minute. I'll tell you in a second here. I'm a little bit nervous. I can't think. I'll tell you in just a minute. I know them all." When asked what he had done to make amends he stated that his daughter had written a letter to the victim's family, and that he [Roderick] had spoken with the victim's sister, who was in jail when Roderick was there, and "she didn't say much about it. She just said she knew how [Obie] was. That's all she had to say." When asked to recite the fourth step Roderick responded, "Continue to take personal inventory, where wrong promptly admit it." When asked if Roderick had taken a "moral inventory" of himself, he replied, "I've been in 20 years. I've been thinking about this everyday, you know. And I just wish it didn't have [sic] happened and sorry that it happened. I can't change what happened but I can change myself."

Roderick's lack of vocational training was also discussed. Roderick explained that he had not acquired a vocation in prison due to his age. "A lot of places if you're over 50 they don't want to get you to class—get into a place. Then at 60, they won't. They don't want a guy taking a trade [at] that age." The commissioners remarked on the various jobs Roderick had undertaken in prison, commented on the fact that he had not gotten his GED (high school general equivalency diploma), and noted that he nevertheless scored 12.9 on the TABE.[10] When asked how he had achieved such a high score Roderick explained he did not know but he "read[s] all the time."

The Panel asked Roderick what he had learned in the Project CHANGE program in 2003. He responded that he learned he had a drinking problem (and stated he knew that already) and he learned that if you do something "you should be accountable for what you do[, a]nd treat other people how you'd like to be treated yourself." Beyond this explanation Roderick had difficulty articulating lessons learned from the program, but stated he "took all the tests." It was also noted that Roderick had taken a class on sexually transmitted diseases.

Roderick's disciplinary actions in prison were reviewed; it was noted there had been none since 1993. When asked why he had not participated in more self-help groups he replied that "[t]hey don't have nothing over there," that "[w]e're locked up all the time," that he did participate in anger management, and that he did not get involved in other programs before Project CHANGE because he was "getting up at two in the morning working the kitchen

---

[10] The TABE score is expressed in a number reflecting grade level. (TABE FAQ's, *supra*, p. 2; see, *ante*, p. 252, fn. 5.) Thus, Roderick tested above the 12th grade level.

and—go[ing back] to sleep in the afternoon. So, I'd get up at two in the morning. I'm tired, I can't go nowheres. I had that job for seven years."

When asked if he posed a threat to the public, Roderick replied he was "no threat to nobody." The Panel then asked "what makes you a different man today than the man that came into prison," and Roderick responded: "Well, I've been in 20 years and I want to live . . . the rest of my life I can outside. And I'm not going to do nothing to jeopardize that. [¶] . . . [¶] . . . I got grandkids. I've never been around them, never did see them. And I haven't seen my kids either. [¶] . . . [¶] I'm a different guy. I'm a different guy than I was 20 years ago. I can tell you that. [¶] . . . [¶] I've been thinking about all this for 20 years for one thing. All that I've done and I'm not proud of myself."

The Panel then reviewed the very favorable 2005 psychological evaluation, including the conclusion that Roderick "does not present a threat to society any more than the average citizen." Additionally, the Panel quoted from the 2003 evaluation, including the observation that Roderick's comments " 're-flect a new sense of insight into his incarceration,' " that he is " 'fully remorseful and aware of the effect of his actions on the victim's family,' " and that due to his advanced age and low risk factors he is appropriate for release consideration.

One of the Panel members then asked Roderick what it was, apart from the fact he had "this family out there," that would make the commissioner feel comfortable that if released he would not commit another crime. Roderick responded that he is "not into committing more crimes. That's all in the past for me. Then my age. I'm going up to my daughter's place. It's out of town. . . . The Police Department and The District Attorney's Office wouldn't even know I'm in the county, as a matter of fact. And I'm not going to live forever. And I want to enjoy my grandkids if I can. And I'm not going to do anything to make them think worse of me than what I've already done to them."

Then came what appeared to be a critical exchange: "[Commissioner]: . . . [Another] Commissioner asked you questions at the beginning of the hearing and repeatedly [sic] your exact words were, stupid is all I can tell you. Well, that's not good enough. [¶] . . . [¶] That's not good enough because the issue is whether or not we can give you the keys to the door and release you into the community. If you don't know the answer to the question, how in the world can we let you out because you might do the same thing all over again. So, the answers to the questions are extremely important. And you sit[] there telling us repeatedly [sic], stupid is all I can tell you. [¶] [Roderick]: Well, I just can't believe that someone would think a guy my age would go out there

and do them crimes that I'd done 30 years ago. [¶] [Commissioner]: Older people kill people all the time. [¶] [Roderick]: It might [have] happened. But I can say that I can't believe that someone could think that a guy my age would go out there and commit them crimes I'd done there 30 years ago, 40 years ago. . . . [¶] [Commissioner]: Have you given any real thought to that type of question? [¶] [Roderick]: Well, I thought a lot—I've been thinking about it for 20 years. And I can say, I can't imagine somebody thinking that a guy my age would go out and do something like I did there 30, 40 years ago. [¶] [Commissioner]: Do you see how important the issue I presented you with earlier of how weak you've been in getting involved in self-help and group programs because you know what, if you'd partook in those programs in the past, you might be able to answer those questions today. But you were sleeping because you were tired from working. [¶] [Roderick]: If I was sleeping, what? [¶] [Commissioner]: You were tired from working and you were sleeping when you could have been going to those programs. [¶] [Roderick]: Well, I don't know what to tell you other than I'm not into doing crimes some more. . . . [¶] [Commissioner]: Okay. [¶] [Roderick]: I'm not going out there—These things 30 and 40 years ago, I can't change it and I'm not going to be doing it again. I can't imagine that you'd think I would go out there and do that again. [¶] [Commissioner]: Thank you, sir, I'll return to the Chair."[11]

The assistant district attorney was then permitted to speak. He argued that Roderick had "no real remorse," that he still "[did] not understand that his killing of Michael Obie was wrong," and that his rendition of the events was inconsistent with the injuries, the witnesses' statements and the jury's verdict. He argued that Roderick had a "long criminal history" and that his release would pose an unreasonable risk of danger to the community.

Defense counsel argued in favor of Roderick's release, citing the positive "Board report,"[12] Roderick's completion of various self-help programs, his consistent attendance at AA meetings, his lack of any recent CDC 115's, his supportive psychological evaluations over the last several years (concluding that Roderick is appropriate for release and that "the prognosis for community living is excellent"), his GAF rating of between 90 and 95, and his anticipated stable income and solid residential plans. She went on to make this point: "Perhaps it is that Mr. Roderick does not articulate his feel[ing]s and thoughts fully under the stress of the hearing. But it is important to know that he does consistently receive above-average work reports and even

---

[11] The chair thereafter noted for the record that Roderick's commitment crime had not occurred 30 or 40 years ago but only 20 years earlier.

[12] This appears to make reference to the positive December 2004 life prisoner evaluation report, discussed above.

excellent ones.[13] And so, this is a man who shows up every day, doesn't get into trouble, and even with the limited self-help programming that is formal, he has managed to avoid problems in a big way since he's been in prison."

After a recess, the Panel returned and announced its decision. The Panel denied Roderick's request for parole, finding that he would pose an unreasonable risk of danger to society or a threat to public safety if released from prison. The Panel based its decision, first, on "the commitment offense" and, specifically, on the fact that once Obie started harassing Roderick "there are a lot of other choices [Roderick] could have made . . . . [He] could have just left. [He] could have just gone home. [He] could have called the police. But that wasn't the choice that [he] made." Next, the Panel cited Roderick's extensive criminal history from 1952 to 1980, and his failure to "profit from society's previous attempts to correct his criminality. Those attempts included county jail, a prior prison term, and probation." Third, the Panel relied upon Roderick's "unstable social history [which] is certainly related to that criminal history but also to the abuse of alcohol." The Panel also stated that Roderick had "programmed in a very limited manner," that he had "failed to upgrade either vocationally or educationally," and that he had "not yet sufficiently participated in beneficial self-help."

On the positive side, the Panel remarked upon the fact that Roderick had only one "128(a) counseling Chrono and that was back in 1991," that he had only three serious CDC 115's, the last one in 1993, that the psychological evaluation was "largely favorable and supportive," and that he had good parole plans with a lot of family support and an opportunity for work.

Ultimately, however, the Panel found, *again*, that "the prisoner needs to participate in self-help in order to understand and cope with stress in a non-destructive manner,"[14] and concluded that, "[i]n view of the prisoner's history and his lack of program participation there's no indication that he would behave differently if paroled."

---

[13] In fact, Roderick received "above average" or "exceptional" ratings for his work during the following periods: March 1987, December 1990, April 1991 to April 1992, December 1992, May 1993, May 1994 through July 2000, December 2000, February 2001 to October 2001, and August 2003 to August 2004.

[14] This stock phrase was used to deny parole to Roderick four times. Apparently it is also used generically across the state. (See, e.g., *In re Dannenberg* (2005) 34 Cal.4th 1061, 1074–1075 [23 Cal.Rptr.3d 417, 104 P.3d 783] (*Dannenberg*); *In re Rosenkrantz* (2002) 29 Cal.4th 616, 633 [128 Cal.Rptr.2d 104, 59 P.3d 174] (*Rosenkrantz*); *In re Barker* (2007) 151 Cal.App.4th 346, 360 [59 Cal.Rptr.3d 746] (*Barker*); *In re Weider* (2006) 145 Cal.App.4th 570, 582 [52 Cal.Rptr.3d 147]; *In re Burns* (2006) 136 Cal.App.4th 1318, 1324 [40 Cal.Rptr.3d 1]; *In re DeLuna* (2005) 126 Cal.App.4th 585, 596 [24 Cal.Rptr.3d 643] (*DeLuna*); *In re Scott* (2004) 119 Cal.App.4th 871, 883 [15 Cal.Rptr.3d 32] (*Scott I*); *In re Morrall* (2002) 102 Cal.App.4th 280, 303 [125 Cal.Rptr.2d 391]; *In re Ramirez* (2001) 94 Cal.App.4th 549, 558 [114 Cal.Rptr.2d 381], disapproved on another ground in *Dannenberg, supra*, 34 Cal.4th at

In closing the Panel stated: "Mr. Roderick, we simply recommend that you continue to remain disciplinary-free. You really need to do some self-help, sir. And if you're not going to do it in a program through the institution, then you can do it on your own by reading some books. But you can't expect us to feel comfortable sending you back out with law-abiding citizens with your history and this crime if you don't know why you led the life you did."

## C. *Petition for Writ of Habeas Corpus*

On July 29, 2005, Roderick filed a petition for writ of habeas corpus requesting that the superior court reverse the Panel's decision. On October 28, 2005, the trial court held an evidentiary hearing in which Roderick was examined regarding his participation in various programs while in prison.

Roderick explained that he was frequently unable to attend AA meetings because he would finish dinner after 8:00 p.m., after which time no inmates were allowed to leave their cells. Otherwise, he attended all AA meetings available. He also briefly described the life skills and Project CHANGE programs.

On November 3, 2005, the superior court issued a ruling granting Roderick's petition, finding that the factors relied upon by the Panel in denying parole were not supported by some evidence in the record.

The Attorney General then filed a motion for reconsideration, arguing that the court should vacate its November 3, 2005, ruling since the court failed to serve the warden and the Board with the order to show cause. The court granted this motion, the Attorney General filed a return to the writ, and Roderick filed a traverse. On March 21, 2006, the superior court entered an order reaffirming the November 3, 2005, ruling granting Roderick's petition for writ of habeas corpus. The Attorney General timely filed this appeal.[15]

## II. DISCUSSION

### A. *Statutory and Regulatory Scheme*

■ The Board's parole decisions are governed by Penal Code section 3041 and Board regulations (Cal. Code Regs., tit. 15,[16] § 2230 et seq.).

---

pp. 1084–1085, 1100; *Biggs v. Terhune* (9th Cir. 2003) 334 F.3d 910, 913 (*Biggs*).) A Westlaw search turned up an additional 25 unpublished federal district court cases in which this reason was applied to deny parole.

[15] Shortly after the trial court's decision was issued, Roderick had his eighth parole hearing; parole was again denied. We grant petitioner's request for judicial notice of the transcript of that hearing.

[16] Unless otherwise indicated, section references are to title 15 of the California Code of Regulations.

Pursuant to statute, the Board "shall normally set a parole release date" one year prior to the inmate's minimum eligible parole release date, and shall set the date "in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public . . . ." (Pen. Code, § 3041, subd. (a).) Subdivision (b) of Penal Code section 3041 provides a release date must be set "unless [the Board] determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." "Accordingly, parole applicants in this state have an expectation that they will be granted parole unless the Board finds, in the exercise of its discretion, that they are unsuitable for parole in light of the circumstances specified by statute and by regulation." (*Rosenkrantz, supra,* 29 Cal.4th at p. 654; see also *In re Smith* (2003) 114 Cal.App.4th 343, 366 [7 Cal.Rptr.3d 655] (*Smith*) ["parole is the rule, rather than the exception"].)

Section 2402 sets forth various factors to be considered by the Board to carry out the mandates of the statute. These regulations are designed to guide the Board's assessment of whether the prisoner poses "an unreasonable risk of danger to society if released from prison," and thus whether he or she is suitable for parole. (§ 2402, subd. (a).)[17] This regulation also lists several circumstances tending to show unsuitability[18] and suitability[19] for parole.

---

[17] These factors include "the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability." (§ 2402, subd. (b).)

[18] Unsuitability factors are: (1) a commitment offense done in an "especially heinous, atrocious or cruel manner"; (2) a "[p]revious [r]ecord of [v]iolence"; (3) "a history of unstable or tumultuous relationships with others"; (4) "[s]adistic [s]exual [o]ffenses"; (5) "a lengthy history of severe mental problems related to the offense"; and (6) "[t]he prisoner has engaged in serious misconduct in prison or jail." (§ 2402, subd. (c)(1)–(6).) This subdivision further provides that "the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel." (§ 2402, subd. (c).)

[19] Suitability factors are: (1) the absence of a juvenile record; (2) "reasonably stable relationships with others"; (3) signs of remorse; (4) a crime committed "as the result of significant stress in [the prisoner's] life"; (5) battered woman syndrome; (6) the lack of "any significant history of violent crime"; (7) "[t]he prisoner's present age reduces the probability of recidivism"; (8) "[t]he prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release"; and (9) the prisoner's "[i]nstitutional activities indicate an enhanced ability to function within the law upon release." (§ 2402, subd. (d)(1)–(9).)

B. *Standard of Review*

▉ In *Rosenkrantz*, our Supreme Court set forth the appropriate standard of review. "[T]he judicial branch is authorized to review the factual basis of a decision of the Board denying parole in order to ensure that the decision comports with the requirements of due process of law, but that in conducting such a review, the court may inquire only whether some evidence in the record before the Board supports the decision to deny parole, based upon the factors specified by statute and regulation. If the decision's consideration of the specified factors is not supported by some evidence in the record and thus is devoid of a factual basis, the court should grant the prisoner's petition for writ of habeas corpus and should order the Board to vacate its decision denying parole and thereafter to proceed in accordance with due process of law." (*Rosenkrantz, supra*, 29 Cal.4th at p. 658.)

This standard "does not require a review of the entire record, but only requires such review as is necessary to determine whether there is *any* evidence in the record supporting the denial." (*In re Van Houten* (2004) 116 Cal.App.4th 339, 347–348 [10 Cal.Rptr.3d 406].) Once there is "some evidence" to support the section 2402 factors relied upon by the Board, "the precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the [Board] . . . . It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole." (*Rosenkrantz, supra*, 29 Cal.4th at p. 677.) However, "the decision must reflect an individualized consideration of the specified criteria and cannot be arbitrary and capricious." (*Ibid.*) Thus, it is not enough that there is some evidence to support the factors cited for denial; that evidence must also rationally support the core determination required by the statute before parole can be denied, i.e., that a prisoner's release will unreasonably endanger public safety. (*In re Lee* (2006) 143 Cal.App.4th 1400, 1408 [49 Cal.Rptr.3d 931] (*Lee*); *In re Scott* (2005) 133 Cal.App.4th 573, 595 [34 Cal.Rptr.3d 905] (*Scott II*).) "Some evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers public safety." (*Lee, supra*, 143 Cal.App.4th at p. 1408.)

The dissent rejects the standard articulated in *Lee* and applied in *In re Elkins* (2006) 144 Cal.App.4th 475, 502 [50 Cal.Rptr.3d 503], *In re Tripp* (2007) 150

Cal.App.4th 306, 313 [58 Cal.Rptr.3d 64], and *Barker, supra*, 151 Cal.App.4th at page 366. The dissent's proposed standard of review would require judicial affirmance of every Board decision if even a single unsuitability factor is found, regardless of whether that factor would rationally support a conclusion, based on individualized consideration, that the inmate would pose an unreasonable risk of danger. (Dis. opn., *post*, at pp. 311–312.) If this were the standard, the courts would indeed be relegated to the status of potted plants. (*Scott I, supra*, 119 Cal.App.4th at p. 898.)

■ The only ground for a parole denial is found in Penal Code section 3041, subdivision (b), which provides that a release date shall be set "unless [the Board] determines that . . . consideration of the public safety requires a more lengthy period of incarceration." Interpreting that standard, our high court has required that the Board's decisions not be arbitrary or capricious (*Rosenkrantz, supra*, 29 Cal.4th at p. 677), and that the Board's decisions be made "on *relevant* grounds" and supported by the evidence (*Dannenberg, supra*, 34 Cal.4th at p. 1071, italics added). We read those directives as mandating that the Board, in its decisions, must articulate reasons that are grounded in evidence *and* rationally related to the statutory basis for denial. The dissent's proposed standard, we think, goes beyond even the deferential "some evidence" standard and would annul any meaningful judicial review. Were we required to engage in the kind of prodigious efforts undertaken by our dissenting colleague to shore up the Board's decisions denying parole, affirmance would be guaranteed in every case.

C. *Factors Relied upon by the Panel in Denying Roderick Parole*

1. *Roderick's Commitment Offense*

■ Section 2402, subdivision (c)(1) provides that a commitment offense carried out "in an especially heinous, atrocious or cruel manner" tends to indicate unsuitability for parole. In determining whether the offense was committed in such a manner, the Board should consider whether "(A) Multiple victims were attacked, injured or killed in the same or separate incidents. [¶] (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder. [¶] (C) The victim was abused, defiled or mutilated during or after the offense. [¶] (D) The offense was carried out in a manner which demonstrates an exceptionally callous

disregard for human suffering. [¶] (E) The motive for the crime is inexplicable or very trivial in relation to the offense." (*Ibid.*)

While the Panel relied upon the commitment offense in denying parole, it failed to cite any of the factors under section 2402, subdivision (c)(1) in its decision. The Panel simply stated its conclusion that Roderick was "not yet suitable for parole" and that "the information that we considered certainly included the commitment offense." Although the Panel then recited the facts of the offense, it made no findings on any of the factors identified in its regulations for determining whether a defendant committed his offense "in an especially heinous, atrocious or cruel manner." (§ 2402, subd. (c)(1).) The trial court, thus, found that there was no basis for the Panel's ostensible finding that the offense was particularly egregious. "No basis [was] set forth. This court was the trial court, and is very familiar with the case. No evidence was presented at trial, and none has been set forth in the transcript before the [Panel], to make the finding."[20]

■ The Attorney General nonetheless argues that the offense met the section 2402, subdivision (c)(1) standard because the record supports a finding that the motive for the murder was trivial. The dissent likewise gives an assist to the Panel by implying findings concerning the commitment offense not articulated in its decision. (Dis. opn., *post*, at pp. 284–286, 293–294.) Given the extraordinarily deferential standard of review we already apply to the Board's decisions, it would be inappropriate for courts to salvage the Board's inadequate findings by inferring factors that might have been relied upon. *At minimum*, the Board is responsible for articulating the grounds for its findings and for citing to evidence supporting those grounds. "[T]he Board must apply detailed standards when evaluating whether an individual inmate is unsuitable for parole on public safety grounds. [Citations.] When the Board bases unsuitability on the circumstances of the commitment offense, it must cite 'some evidence' of aggravating facts *beyond the minimum elements of that offense.* [Citation]." (*Dannenberg, supra*, 34 Cal.4th at p. 1096, fn. 16.) Accordingly, "[w]e must confine our review to the stated factors found by the Board, and all the evidence presented at the parole hearing which is relevant to those findings, not to findings that the Attorney General . . . suggests the Board might have made." (*DeLuna, supra*, 126 Cal.App.4th at pp. 593–594.)

But even if the Panel had determined that the crime was particularly egregious because the motive for the murder was "very trivial in relation to the offense" (§ 2402, subd. (c)(1)(E)), the evidence would not support such a finding.

---

[20] In reaching our decision we do not consider the trial court's reference to its familiarity with the facts as revealed during the trial. We review only the record before the Panel. (*Rosenkrantz, supra*, 29 Cal.4th at p. 658.)

Here, the facts contained in the record reflect that the victim began harassing Roderick in a saloon. Roderick was intoxicated and started a physical fight, punching the victim twice. In the course of the altercation, the victim pulled a hunting knife, and Roderick wrestled it away and stabbed him. There is evidence that the victim had also been drinking, and that Roderick did not realize he had effected a mortal wound. Without trivializing this tragic loss of life, the scenario appears to be nothing more than a drunken midnight brawl outside of a saloon that escalated—with the appearance of a knife—to mortal combat. The motive for the killing was not inexplicable or trivial in its context. As in *Scott I, supra,* 119 Cal.App.4th at page 894, in this case there is no evidence to support a finding that the motive for the murder was less significant than in other second degree murder cases.

The dissent takes issue with *Scott I*'s "comparative analysis" approach to determining the relative triviality of motive in second degree homicide cases, and agrees with the *Scott I* dissent that motive must merely be tested against the crime to determine its triviality. (Dis. opn., *post,* at pp. 286–288.) Under this view, few—if any—motives would *not* be trivial relative to the kind of findings that are required to convict on first or second degree murder. (*Barker, supra,* 151 Cal.App.4th at p. 374 ["[g]iven the high value our society places upon life, there is no motive for unlawfully taking the life of another human being that could not reasonably be deemed 'trivial' "].) But we need not resolve this issue because *Scott I* is not central to, nor even necessary to, our conclusion that the killing here was not particularly egregious. The core test for determining whether a crime is carried out in a particularly heinous, atrocious or cruel manner is whether the crime involves actions that are more aggravated or violent than the minimum necessary to sustain a conviction for that offense. (*Rosenkrantz, supra,* 29 Cal.4th at p. 683.) We cannot conclude, and the Panel has not stated, that this crime involves actions more aggravated or violent than the minimum necessary to sustain a conviction for second degree murder.

The Attorney General also contends that Roderick's failure to avoid the murder when he had the opportunity to do so would support a finding under section 2402, subdivision (c)(1) that the crime was particularly egregious. In its decision, the Panel stated "[a]nd there are a lot of other choices that you could have made, Mr. Roderick. You could have just left. You could have just gone home. You could have called the police. But that wasn't the choice that you made."

■ That a prisoner could have avoided his or her commitment offense is not one of the section 2402, subdivision (c)(1) factors to be considered by the Board in determining whether the offense was committed in an "especially heinous, atrocious or cruel manner." (See *Rosenkrantz, supra,* 29 Cal.4th at

p. 658 ["the court may inquire only whether some evidence in the record before the Board supports the decision to deny parole, based upon the factors specified by statute and regulation"].) We observe, however, that in *Smith* the court upheld the Governor's determination that the defendant's murder of his wife was "aggravated" based on a constellation of factors that included use of a gun; vulnerability of the victim; planning, sophistication and professionalism; premeditation; a special relationship of trust with the victim; and an ongoing pattern of physical and mental abuse; as well as the fact that the defendant "had an opportunity to stop his crime but instead continued." (*Smith, supra,* 114 Cal.App.4th at pp. 349, 368.) In our view, *Smith* is not useful precedent.

To begin with, we are not convinced that, as a general principle, a lost opportunity to stop a crime would ever tend to prove the heinousness, cruelty or atrociousness of a crime. The mere fact that "there are a lot of other choices" a person could have made—as distinguished, for example, from evidence of premeditation or stalking (see, e.g., *Rosenkrantz, supra,* 29 Cal.4th at p. 678; *DeLuna, supra,* 126 Cal.App.4th at p. 593)—does not rationally support a finding that a crime was committed in an especially heinous, atrocious or cruel *manner.* To state that a defendant "could have just left" or "could have just gone home" says nothing more than the defendant could have chosen not to pick the fight or mortally wound his victim; these facts do not describe the *manner* in which the murder was committed. But even if they did, *Smith* held only that continuing with a crime after having an opportunity to stop *taken together* with the other enumerated factors constituted evidence to support a finding that the offense was aggravated. (*Smith, supra,* 114 Cal.App.4th at p. 368.) Here, no other similar circumstances exist.

In sum, there is no evidence that Roderick's commitment offense was carried out in "an especially heinous, atrocious or cruel manner" as set forth in section 2402, subdivision (c)(1).

### 2. *Roderick's Social History*

██ Under section 2402, subdivision (b), the Board is directed to consider the "circumstances of the prisoner's social history" in determining his or her suitability for parole. An "[u]nstable [s]ocial [h]istory," which is defined as "a history of unstable or tumultuous relationships with others," is one circumstance tending to show unsuitability. (§ 2402, subd. (c)(3).) In its decision, the Panel's only reference to social history is a generalized statement that Roderick's "unstable social history is certainly related to [his] criminal history but also to the abuse of alcohol." But the Panel cited no facts or circumstances to support its premise that Roderick had an unstable *social* history (as distinguished from his criminal history) and we see no evidence that would bear it out.

The Attorney General cites as "some evidence" of Roderick's unstable social history the facts that Roderick (1) was raised by his paternal grandmother and dropped out of school after the 11th grade; (2) had no contact with his estranged mother until he was 16, even though she lived within 40 miles of him; and (3) continued to engage in criminal activity during his 20-year marriage. The dissent also cites the first two enumerated factors as some evidence of an unstable social history. (Dis. opn., *post*, at pp. 293–294.) We cannot agree that these factors constitute an "[u]nstable [s]ocial [h]istory," nor do they provide any evidence of unstable or tumultuous relationships with others.

The record shows an *absence* of any relationship with his natural parents, not any unstable or tumultuous relationships. That he was raised by his grandmother and failed to complete his final year of high school is also not evidence of a history of problematic relationships or instability. Indeed, it was during this period that Roderick seems to have had his most stable social history, because his chronic criminal behavior did not commence until he turned 20.[21]

With respect to his adult years, Roderick's "history shows a long term marriage, producing two children with whom he has a good relationship." While Roderick committed crimes and experienced problems with alcohol during his marriage, there is no evidence that this affected his relationship with either his wife or his children.[22] (See *DeLuna, supra,* 126 Cal.App.4th at p. 595 [finding no evidence that the prisoner's alcohol problem contributed to unstable relationships].) To the contrary, Roderick's 1999 psychological evaluation indicates that he has maintained stable relationships with his family. "Letters in [Roderick's] Central file from his ex-wife express[] an interest in his coming to live with her upon parole so this inmate still has a very good relationship with his family." Roderick also stays in close touch with his two daughters; at the hearing he readily indicated the age range of his nine grandchildren, and volunteered the fact that his oldest granddaughter was about to have a baby. Even the Panel noted that Roderick has "a lot of family support" and that his "daughter's letter was very supportive in offering a home and also an opportunity for work."

Additionally, there is no evidence to support a finding that Roderick had difficult relationships with other prisoners and prison staff. The record

---

[21] In 1994 Roderick told the clinical psychologist that he had been incarcerated in the "Youth Authority" at the age of 14. Assuming this to be accurate, it appears to be an isolated incident, as there is no record of any juvenile arrests in his file.

[22] It can be argued that the regulation is premised upon the assumption that the stability of relationships helps to prevent crime, and in Roderick's case the premise did not hold. Whether or not that is the intent of the regulation, there is still no evidence to support a finding of unstable relationships.

supports a contrary conclusion. Dr. Hewchuk noted that Roderick "has continued to be a model prisoner . . . [and] has maintained full institutional compliance." And Dr. Steward reported that Roderick "has had a near exceptional record given the number of years in prison. He has only been found guilty of [three CDC 115's], has attended numerous self help programs and takes his problem with drinking seriously." Roderick's work reports were, for the most part, above average or exceptional. There were no unsatisfactory ratings, and he has received only one negative "counseling Chrono."[23]

The dissent points to Roderick's alcohol abuse and criminal history as some evidence of an unstable social history. (Dis. opn., *post*, at pp. 293–295.) We read the regulations as distinguishing between criminal history and social history (§ 2402, subd. (b)) with the latter being defined in terms of social relationships (§ 2402, subd. (c)(3)) as distinguished from criminal activity. The two factors are thus distinct and should not be conflated. Similarly, while there is ample evidence that Roderick's alcoholism contributed to his criminal activities, there is no evidence that it resulted in any unstable or tumultuous relationships or to any "[u]nstable [s]ocial [h]istory" apart from his criminal history. (See *DeLuna, supra*, 126 Cal.App.4th at p. 595.) Nor is there any evidence that Roderick is at risk of returning to alcohol abuse if he were released, after more than 20 years of sobriety and more than 12 years of active participation in AA. (See *Smith, supra*, 114 Cal.App.4th at p. 372 [if defendant's past use of drugs established his unsuitability for parole, "then the [Board] could deny parole for the rest of [the defendant's] life based on this immutable factor, without regard to or consideration of subsequent circumstances and evidence indicating that he has no current desire for drugs and that there is little current likelihood of drug relapse . . ."].)[24]

In sum, we see no evidence in the record upon which the Panel could have relied in finding that Roderick has an unstable social history or problematic, tumultuous relationships pursuant to section 2402, subdivision (c)(3). On the contrary, the evidence indicates that Roderick has actually "experienced reasonably stable relationships with others," a factor tending to show *suitability* for parole. (§ 2402, subd. (d)(2).)

---

[23] A "Custodial Counseling Chrono" (CDC Form 128-A) documents minor misconduct and the counseling provided for it. (§ 3312, subd. (a)(2).)

[24] The Panel also failed to consider that Roderick's parole could be conditioned upon regular attendance at AA meetings and random testing to further ensure public safety. (§ 2402, subd. (b).)

3. *Roderick's Past and Present Attitude Toward His Commitment Offense*

Under section 2402, subdivision (b), the Board must consider the prisoner's "past and present attitude toward the [commitment] crime" in determining suitability for parole. In denying parole, the Panel stated that Roderick "needs to participate in self-help . . . in order to understand the underlying factors that led not only to this commitment offense, but also to his entire criminal history, and also to develop insight into the impact of his criminal behavior and in particular, the impact of this crime where a man lost his life." According to the Attorney General, the Panel relied on Roderick's testimony at the hearing in making its finding on this factor, including his reply "[s]tupid is all I can tell you" when asked for an explanation of his extensive criminal history.

We see no evidence to support a conclusion that Roderick lacked insight into the *impact* of his criminal behavior or his commitment crime. In Roderick's 2003 evaluation, Dr. Hewchuk stated that "Roderick talked openly about the circumstances of the instant offense, and his comments reflect a new sense of insight into his incarceration. He is fully remorseful, and aware of the effect of his actions on the victim's family." In 1999, Dr. Carswell stated that "[t]his inmate is very remorseful for causing the victim's family grief, and he is as sorry for taking this time away from his own family." While in the early stages of his incarceration Roderick denied any criminal act and insisted the stabbing was in self-defense, over the years, after participating in AA and other programs, he was able to acknowledge his responsibility and express his regret and then remorse for his actions. We can find no evidence that Roderick currently does not understand the impact of his crime.

The dissent concludes Roderick's attitude toward the crime was "poor," characterizing Roderick's statement regarding his role in the crime as merely a passive or defensive one ("the victim was fatally injured during a struggle over the knife"). (Dis. opn., *post*, at p. 297.) In fact, Roderick admitted at the hearing that he intentionally stabbed Obie; he stated that he thought about stabbing him in the leg or the butt, but decided against it and, instead, stabbed him in the chest. He asserted no claim of self-defense in describing the crime. This is in contrast to Roderick's early claims, in 1989, 1992 and 1994, that the killing was in self-defense and that he had been " 'rail-roaded.' " Since that time, however, and over the course of his incarceration, as has been discussed, Roderick came to accept responsibility and express remorse for the crime.

The Attorney General and the dissent cite the district attorney's *argument* that Roderick had shown no remorse and his *argument* that Roderick believed

the murder "was the right thing to do." (See dis. opn., *post*, at p. 297.) But the record does not support the district attorney's arguments and the Attorney General cites no evidence in corroboration.[25]

Expanding upon the section 2402, subdivision (b) factors, the Panel also questioned Roderick concerning why he led a life of crime. Roderick acknowledged his extensive criminal record, admitted he had no excuse for it, seemed to appreciate its connection to his alcoholism, and described his criminal behavior as "[s]tupid." The Panel felt this was insufficient to demonstrate that he understood the "underlying factors that led not only to [his] commitment offense, but also to his entire criminal history" and concluded, "you can't expect us to feel comfortable sending you back out with law-abiding citizens with your history and this crime if you don't know why you led the life you did." That the Panel members were dissatisfied with Roderick's responses was manifest. The question before us, however, is whether it is arbitrary and capricious for the Panel to rely on those responses to support a denial of parole.

Certainly, Roderick's responses were unsophisticated and lacked analytical depth. But is his inability to articulate a more insightful explanation as to why he committed multiple crimes some evidence that Roderick poses a danger to public safety? The record does not support that conclusion.[26] The evidence does show that Roderick has a limited capacity either to understand or to explain the mechanisms that led to his criminality. But this limitation is a known quantity and has been factored into his risk assessment. Roderick's 1999 evaluation observes that Roderick "had a difficult time understanding the complexity of substance abuse," and demonstrated "minimal" insight into his commitment offense. But Dr. Carswell went on to explain that Roderick's "place of development within the structure of the offense is appropriate" because, in talking about the crime, Roderick stated that "he shall never drink again and should not have been drinking at the time[,] . . . had he not been drinking, he could have made a better decision, and that the decision he did make was not a responsible one." Despite this rather rudimentary level of insight, the report concluded that Roderick, at 67 years of age, after 14 years

---

[25] The Attorney General also cites to the district attorney's argument that Roderick's version of the crime was inconsistent with "the victim's injuries, the statements of the witnesses and the verdict of the jury." Again, the Attorney General cites no evidence that demonstrates these alleged discrepancies.

[26] In so stating, we do not mean to undervalue the inmate's demeanor at his parole hearing. Just like trial judges, parole hearing commissioners are in the best position to evaluate both the credibility and the attitude of the inmate in the course of the hearing, and we must defer to those judgments. Here, however, the Panel members did not disbelieve Roderick, nor did they take him to task for displaying a defiant or indifferent attitude—something they are known to comment upon when it occurs. (See, e.g., *ante*, at pp. 249–250.) It was only the content of Roderick's responses that did not satisfy the Panel.

of incarceration "has developed his maturity to such an extent that he would be an excellent candidate at this time for parole"; and that "[i]f released to the community [he would] pose no more danger than the average citizen." Building on the 1999 report, the 2003 evaluation also concluded Roderick would "be able to integrate back into the community with few problems," and "would pose no more danger than the average citizen . . . . with an extremely low probability of recidivism." Without commenting on Roderick's level of insight, the 2005 evaluation reaches the same conclusion. These reports are in stark contrast to Roderick's early evaluations (1989–1994) which reflect "little self-understanding" and a failure to accept responsibility for his commitment crime or his prior criminal history. The watershed year appears to be 1997, where it is reported that Roderick expressed his regret for the crime and "wished he had handled it somehow differently."

Roderick provided a less than incisive explanation for his chronic criminality, but his responses also reflected acceptance of his alcoholism, acknowledgement of responsibility for his crimes, remorse, and shame. Ignoring the unanimous clinical evidence to the contrary presented by trained experts—since 1999 all psychological reports conclude he would pose no more danger to society than the average citizen—the Panel's arbitrary pronouncement that Roderick's limited insight poses an unreasonable risk to public safety cannot be considered some evidence to support a denial of parole. (*Biggs, supra,* 334 F.3d at p. 915 [denial of parole must be based on some evidence, and the evidence " 'must have some indicia of reliability' "].)[27]

---

[27] The dissent maintains we must defer to the Board's subjective analysis of an inmate's suitability for parole because the hearing officers conduct thousands of hearings each year and, thus, have the opportunity to "evaluate[] participation in, and successful completion of, programs for a great number of prisoners." (Dis. opn., *post,* at p. 312.) Further, having listened to a multitude of inmates, the hearing officers can assess an inmate's attitude toward the Board, and toward his criminal history, his commitment crime, and his programs. (*Ibid.*) But experience does not necessarily translate into expertise. Indeed, together with the dissent we have spent more than 80 pages trying to divine what evidence the Panel relied on in denying Roderick parole. The Panel's inability to state with clarity, in a nonconclusory manner, that which is central to its role in California's parole system indicates that such subjective analyses do not suffice. What is required is an objective analysis predicated upon evidence and adequately articulated. Further, given the statistically small number of life-term inmates actually released, it is not possible to draw credible conclusions either about the "success[]" of institutional programs or the insightfulness of the Board's subjective analyses over time. For example, as of December 31, 2002, there were nearly 10,000 inmates serving time for second degree murder; during 2003, 13 were released. (Cal. Dept. of Corrections & Rehabilitation, Prisoners & Parolees, 2003 (2005) table 9, p. 33 <http://www.cdcr.ca.gov/ReportsResearch/ OffenderInfoServices/Annual/CalPris/CALPRISd2003.pdf> [as of Aug. 17, 2007]; Cal. Dept. of Corrections & Rehabilitation, Recidivism Rates (Recidivism Rates), 2003 (Apr. 26, 2007) 1st table, p. 1 <http://www.cdcr.ca.gov/ReportsResearch/OffenderInfoServices/ Annual/RECID3/Recid3d2003.pdf> [as of Aug. 17, 2007].) In each of the preceding three years, four inmates serving sentences for murder were released. (Recidivism Rates, 2002 (Mar. 22, 2006) 1st table, p. 1 <http://www.cdcr.ca.gov/ReportsResearch/OffenderInfoServices/

### 4. *Roderick's Institutional Behavior*

 "[A prisoner's] postcommitment institutional behavior is relevant to his suitability for parole." (*DeLuna, supra,* 126 Cal.App.4th at p. 595; see § 2402, subd. (d)(9).) As to this factor, the Panel made the following findings: "Mr. Roderick has programmed in a very limited manner. He's failed to upgrade either vocationally or educationally and has not yet sufficiently participated in beneficial self-help." The Panel concluded that Roderick needed to participate in more self-help "in order to understand and cope with stress in a non-destructive manner." The Panel's "find[ing]" that Roderick is in need of additional "programm[ing]" as well as vocational and educational "upgrade[s]," is without support in the record, and there is not a scintilla of evidence that would support the conclusion that these findings demonstrate Roderick's release would constitute an unreasonable risk to public safety.

### a. *Roderick's "[L]imited" Programming*

At the time of the hearing Roderick had participated in AA for more than 12 years, had completed a life skills group program that met one hour each week for 10 weeks, had completed an anger management course, had completed a course on sexually transmitted diseases, and had also completed a 44-week program called Project CHANGE. His work performance during incarceration ranged from "satisfactory" to "exceptional," with his most recent supervisor report reflecting an "exceptional performance rating." There are no recommendations in any of Roderick's recent institutional evaluations indicating a need for additional therapy or self-help. For example, in 2005, Dr. Steward related that Roderick "has attended all of the self help groups available in the prison such as Anger Management and Alcoholics Anonymous." In 2003, Dr. Hewchuk noted that since Roderick's last psychological evaluation in 1999, "he has continued to be a model prisoner within the facility," and that Roderick "freely admitted to a former problem with alcohol, and has dealt with this issue through membership and attendance at Alcoholics Anonymous meetings."

In short, there is no evidence to support the Panel's determination that Roderick's programming was in any way "limited" or deficient. The Panel did not describe—and we cannot find in the record—any evidence that Roderick was in need of specific programs or that there were programs available to him that he failed or refused to attend. Rather, the evidence indicates only that Roderick was unable to attend programs because of his work schedule, because of his meal schedule, because of lockdowns, or because no programs were available. Although the dissent denigrates these as

convenient excuses (dis. opn., *post*, at p. 303), there is not a shred of evidence controverting the legitimacy of Roderick's explanations. Indeed, in the past the Panel has acknowledged a dearth of available programming.

The Panel also expressed concern that Roderick had not gained enough insight from the classes he had taken. As we have already explained, Roderick's inability to gain or articulate a better understanding of his behavior is a known factor that, according to all reports, does not negatively affect his suitability for parole. Additionally, we must consider the circumstances under which Roderick was responding. It was clear he was quite nervous. Moreover, we can discern even on the cold record that the questioning by one Panel member, plainly irritated at Roderick's inability to give the kind of answers he expected to hear, became quite antagonistic. He even criticized Roderick for not attending programs available in the afternoons because he was sleeping, despite the fact that Roderick's job in the canteen required him to begin work at 2:00 a.m. It could not have been surprising that at this point Roderick's responses were more defensive than introspective.[28]

On this record, the Panel's conclusion that "there's no indication that [Roderick] would behave differently if paroled" in view of his "lack of program participation" is unsubstantiated speculation. And the Panel's recital of the stock phrase that Roderick still needs more self-help in order to learn how "to understand and cope with stress in a non-destructive manner" is utterly specious. Since at least 1993 Roderick has coped with the many stresses of prison life in a nondestructive manner. No evidence supports the Panel's unadorned opinion that if released to live with his family, Roderick will become unable to cope with stress in a nondestructive manner. (See *Irons v. Warden of California State Prison-Solano* (E.D.Cal. 2005) 358 F.Supp.2d 936, 948 (*Irons I*) [Board's lay opinion that inmate needs more therapy to "understand and cope with stress in a non-destructive manner" was without medical or other evidentiary support, and "appears to be simply [a reason] repeated often in order to add another factor to the non-suitability conclusion"].)[29]

b. *Roderick's Failure to Upgrade Vocationally and Educationally*

In denying parole, the Panel also found that Roderick had "failed to upgrade either vocationally or educationally" while in prison. While this

---

[28] The same two Panel members (plus a third) presided over Roderick's 2006 parole hearing. That Panel denied parole for *two* years to the then 74-year-old Roderick despite continued exemplary prison behavior.

[29] *Irons I* was reversed in *Irons v. Carey* (9th Cir. 2007) 479 F.3d 658, 663–665 (*Irons II*). The Ninth Circuit, however, expressly agreed with the district court's finding that the Board's determination that Irons needed more therapy was unsupported by any evidence. (*Ibid.*; see also, *ante*, at pp. 260–261, fn. 14.)

finding as a general matter would be "other information which bears on the prisoner's suitability for release" under section 2402, subdivision (b), in Roderick's case, the additional training simply is not relevant to his parole suitability. Given Roderick's advanced age, his eligibility to receive Social Security payments, and his plans to live in his daughter's household and work with his son-in-law, there is no evidence indicating that further vocational or educational training would make him more suitable for parole. Indeed, the Panel itself concluded in 2002 that upgrading his vocational skills was no longer a concern. In its November 2002 decision denying him parole, a commissioner of the Panel stated: "I'm a little disappointed that you hadn't completed a vocation in this term or your prior terms, but you're to the age now where you're probably not going to really need to use that on the outside and probably would just be taking up space for somebody that would really need to learn a vocational skill." Having told Roderick in 2002 that vocational training was unnecessary at his age to attain parole, it would be arbitrary and irrational for the Panel now to withhold parole based on his failure to engage in further vocational training.

In any case, additional training or education would not have improved Roderick's chances for economic success upon release. Roderick stated that he planned to work with his son-in-law who is employed as a contract logger. Because Roderick worked in the logging industry before his incarceration, any vocational or educational training in prison would not have further prepared him for this type of employment. Paraphrasing the court in *DeLuna*, "we do not perceive any connection between [training] . . . and the [Panel's] conclusion that '[Roderick] would pose an unreasonable risk of danger to society or a threat to public safety if released from prison.' Nothing in the record indicates that [Roderick's] criminality or ability to support himself was affected by any limitation of his vocational . . . skills." (*DeLuna, supra,* 126 Cal.App.4th at p. 597.)[30]

### 5. *Roderick's Past Criminal History*

 A prisoner's "past criminal history, including involvement in other criminal misconduct which is reliably documented" is relevant in determining his or her suitability for parole. (§ 2402, subd. (b).) Also, a "[p]revious [r]ecord of [v]iolence" is a circumstance tending to show unsuitability for parole. (§ 2402, subd. (c)(2).) In denying Roderick parole, the Panel found that he "has an extensive criminal history starting in 1952 . . . related to traffic violations, Vehicle Code violations, pretty much continuously, almost without a break until this crime in 1980."

---

[30] The dissent makes the point that Roderick also never obtained a GED while incarcerated. (Dis. opn., *post,* at p. 300.) We question the relevance of that concern, given Roderick's age and his TABE score of 12.9. (See, *ante,* at p. 257 & fn. 10.)

The record does reflect Roderick's long criminal history over 28 years, including two prior violent crimes. Thus, the Panel's finding that Roderick has an extensive criminal history is most certainly supported by the evidence. The question, however, is whether, on this individualized record, the criminal history constitutes some evidence to support the Panel's conclusion that Roderick poses an unreasonable risk of danger to the public safety. "If one or more of the factors [relied upon by the board] lacks evidentiary support, the next questions are whether the Board would have denied parole based upon the supported factors and whether this result 'satisfies the requirements of due process of law' because the factors for which there is some evidence 'constitute a sufficient basis supporting the . . . discretionary decision to deny parole.' " (*DeLuna, supra,* 126 Cal.App.4th at p. 598, quoting *Rosenkrantz, supra,* 29 Cal.4th at p. 677.) "We will uphold the denial of parole when it appears that the Board would have reached the same conclusion based on the supported factors and those factors individually or collectively justify that conclusion." (*DeLuna, supra,* 126 Cal.App.4th at p. 598.) "On the other hand, the 'decision cannot stand' when findings on important factors lack evidentiary support and it is not clear that the Board would have reached the same conclusion based on the supported factors." (*Ibid.*)

The relevant question then is whether the Panel would have denied Roderick parole based only on his past criminal history. In *Rosenkrantz* our high court stated that " '[t]he Board's authority to make an exception [to the requirement of setting a parole date] based on the gravity of a life term inmate's . . . past offenses should not operate so as to swallow the rule that parole is "normally" to be granted. Otherwise, the Board's case-by-case rulings would destroy the proportionality contemplated by Penal Code section 3041, subdivision (a), and also by the murder statutes, which provide distinct terms of life without possibility of parole, 25 years to life, and 15 years to life for various degrees and kinds of murder. [Citation.]' " (*Rosenkrantz, supra,* 29 Cal.4th at p. 683.) "[T]he parole board's sole supportable reliance on the gravity of the offense and conduct prior to imprisonment to justify denial of parole can be initially justified as fulfilling the requirements set forth by state law. Over time, however, should [the inmate] continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of [the commitment] offense and prior conduct would raise serious questions involving his liberty interest in parole. [¶] . . . A continued reliance in the future on an unchanging factor, . . . conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." (*Biggs, supra,* 334 F.3d at pp. 916–917.)

The dissent construes *Sass v. California Bd. of Prison Terms* (9th Cir. 2006) 461 F.3d 1123 as having abrogated the principle announced in *Biggs,* citing to

*Robles v. Solis* (N.D.Cal., Oct. 12, 2006, No. C04-2529CRB) 2006 U.S.Dist. Lexis 77086, 2006 WL 2934086. (Dis. opn., *post*, at p. 308.)[31] We do not agree. As recently explained, "*Sass* did not dispute the principle that, other things being equal, a criminal act committed 50 years ago is less probative of a prisoner's current dangerousness than one committed 10 years ago." (*McCullough v. Kane* (N.D.Cal. June 1, 2007, No. C05-2207MHP) 2007 U.S.Dist. Lexis 43674, 2007 WL 1593227 at p. *8.) Thus, "the message of [*Biggs, Sass,* and *Irons II*] is that the [Board] and Governor can look at immutable events, such as the nature of the conviction offense and pre-conviction criminality, to predict that the prisoner is not currently suitable for parole even after the initial denial (*Sass*), but the weight to be attributed to those immutable events should decrease over time as a predictor of future dangerousness as the years pass and the prisoner demonstrates favorable behavior (*Biggs* and *Irons*). . . . Not only does the passage of time in prison count for something, exemplary behavior and rehabilitation in prison count for something according to *Biggs* and *Irons*. *Superintendent v. Hill*'s standard [(*Superintendent v. Hill* (1985) 472 U.S. 445 [86 L.Ed.2d 356, 105 S.Ct. 2768])] might be quite low, but it does require that the decision *not* be arbitrary." (*Id.* at pp. *7, *8.) Applying this standard, the court in *McCullough* concluded the Governor had violated the inmate's due process rights by denying parole 21 years into a 15-year-to-life sentence based only upon the commitment offense and past criminality, in the face of an exceptional prison record. (*Id.* at p. *9.)

In this case Roderick has a long criminal history fueled by his alcohol abuse. However, since he has been incarcerated, Roderick has exhibited exemplary behavior, with few serious disciplinary violations (none since 1993), and excellent work reports. He has attended AA meetings since at least 1992, and all of the evidence in the record indicates that Roderick's alcoholism is, and will remain, in remission. Roderick has maintained close ties with his family, has no diagnosed mental or personality disorders, and has expressed shame and remorse for his criminal history. For more than six years prior to his most recent parole denial, Roderick has been assessed as posing no more danger to the public than the average citizen, particularly given his advanced age. Against the immutability of Roderick's past criminal history and its diminishing predictive value for future conduct, these factors must be considered. (*Scott II, supra,* 133 Cal.App.4th at pp. 594–595 [reliance on an immutable factor without regard to subsequent circumstance may be a due process violation].) Therefore, it is not at all evident the Panel would have found Roderick unsuitable for parole based solely on this factor.

---

[31] "Opinions of the United States District Court that have not been published in the Federal Supplement are properly cited by this court as persuasive, although not precedential, authority." (*Schlessinger v. Holland America* (2004) 120 Cal.App.4th 552, 559, fn. 4 [16 Cal.Rptr.3d 5].)

### 6. *Conclusion*

Of the five section 2402, subdivision (b) factors relied upon by the Panel in denying Roderick parole, only one—Roderick's past criminal history—constitutes some evidence to conclude that Roderick would pose an unreasonable risk of danger if released. As of 2005, Roderick had served 20 years of a 16-year-to-life sentence, the last 12 of those years with a perfect disciplinary record. Roderick does have a lengthy rap sheet, but subsequent circumstances have indisputably shown that Roderick has become "a competent and responsible person who has done quite well while incarcerated." And, "[g]iven everything inmate Roderick has learned, his age and the fact that he has experienced a 'slowing down' during the last year, due to aging, he would make an excellent candidate for parole." The Board must therefore consider whether the immutable factor of his past criminal history, in light of the record as a whole and this decision, is a sufficient basis upon which to conclude that Roderick would pose an unreasonable risk of danger to the public if he were released.

## III. DISPOSITION

The order is affirmed. The Board is ordered to vacate the denial of parole and to conduct a new parole suitability hearing for Roderick consistent with this opinion. The hearing shall be held no later than November 14, 2007.

Ruvolo, P. J., concurred.

**SEPULVEDA, J.,** Dissenting.—I respectfully dissent. Whether the prisoner Alfred William Roderick is suitable for parole may be a close question. This panel, if determining that question in the first instance, might well set a parole date for him. We may not agree with the Board of Prison Terms's (Board)[1] decision. We may not believe there is substantial evidence supporting unsuitability and that if we were reviewing the record under a sufficiency of the evidence standard, that the record would not support the Board's decision. We may believe there is more evidence in the record supporting his suitability than there is supporting unsuitability. We may, in fact, believe that the evidence supporting suitability substantially outweighs that favoring unsuitability. We may even believe that the evidence supporting suitability is overwhelming. We may strongly feel that the state's money, or our money as taxpayers, could be better spent than by continuing to house this prisoner in state prison. We may feel sorry for the prisoner. We may feel that his age calls out for his release. We may disagree with the entire statutory scheme governing the setting of parole dates for life prisoners. None of these beliefs,

---

[1] The Board of Prison Terms was abolished in 2005 and replaced by the Board of Parole Hearings. (See Gov. Code, § 12838.4; Pen. Code, § 5075.)

however, matters under the very deferential standard of review that we are compelled to apply. Our role on review is extremely limited and does not permit us to be impacted by any of these factors. Nor are we permitted to manipulate the deferential standard of review in an attempt to effectuate a change in a statutory scheme that we may find distasteful.

Under the extremely deferential standard of review applicable in this case, the only issue before us is whether there is even a modicum of evidence to support the Board's decision. Stated differently, unless the record is absolutely devoid of even the slightest evidence supporting the Board's determination that Roderick is unsuitable for parole, we are required to affirm its decision. While the facts of this case are not as egregious as some recent cases where reviewing courts overturned either the Board's or the Governor's decision finding an inmate unsuitable for parole, and while it might therefore be tempting just to "go along" with the majority, I write separately because I view the majority here as symptomatic of recent decisions that appear to succumb to the temptation to substitute the reviewing court's evaluation of suitability for parole for that properly vested in the Board or in the Governor. In many of these cases the appellate courts appear to determine first whether they *personally* believe the prisoner should have been granted parole (or, perhaps more aptly put, whether *they* would have found him suitable for parole had they been the decision maker), and then review the record through a lens created by their own sense of justice. By subtle manipulation of the standard of review, along with what often appears to be a hypercritical evaluation of the evidence relied upon by the Board or the Governor, these cases slowly but surely erode the highly deferential standard of review that is mandated in these cases.[2] As the United States Supreme Court stated in *Superintendent v. Hill* (1985) 472 U.S. 445, 455 [86 L.Ed.2d 356, 105 S.Ct. 2768], while due process requires *some* evidentiary basis for the Board's decision, that does not imply that the Board's factual findings "are subject to second-guessing upon review." Second-guessing, it appears to me, is exactly the path that the majority and several other reviewing courts have ventured down recently. Having examined the record, and applying the appropriate standard of review, I would reverse the trial court's order granting Roderick's petition for writ of habeas corpus.

---

[2] Embraced by the majority here, *In re Scott* (2004) 119 Cal.App.4th 871 [15 Cal.Rptr.3d 32] (*Scott I*) concluded that the deferential standard of review set forth in *In re Rosenkrantz* (2002) 29 Cal.4th 616 [128 Cal.Rptr.2d 104, 59 P.3d 174] (*Rosenkrantz*), while it requires us to be "exceedingly deferential" to the Board's findings, "does not convert a court reviewing the denial of parole into a potted plant." (*Scott I, supra,* 119 Cal.App.4th at p. 898; see maj. opn., *ante*, at p. 264.) Several post-*Rosenkrantz* decisions seem to adopt a similar attitude toward the deferential standard of review, stretching it far beyond its required confines, as discussed *post*.

*Standard of Review*

The majority correctly summarizes the applicable standard of review, although it then succumbs to the temptation to ignore it and apply its own sense of justice to the case. It is therefore worthwhile to review the highly deferential standard of review we must be bound by here. The California Supreme Court has described the Board's discretion in parole matters as " 'great' " and " 'almost unlimited,' " but it has also indicated that it is not absolute, as it is subject to a prisoner's right to procedural due process. The Board's decision must therefore have a factual basis, and "not be based on 'whim, caprice, or rumor.' [Citation.]" (*In re Powell* (1988) 45 Cal.3d 894, 902 [248 Cal.Rptr. 431, 755 P.2d 881].) The Board's decision regarding suitability is subject to judicial review; however, that review is extremely limited. "[T]he judicial branch is authorized to review the factual basis of a decision of the Board denying parole in order to ensure that the decision comports with the requirements of due process of law, but that in conducting such a review, the court may inquire only whether *some* evidence in the record before the Board supports the decision to deny parole, based upon the factors specified by statute and regulation. If the decision's consideration· of the specified factors is not supported by *some* evidence in the record and thus is *devoid of a factual basis*, the court should grant the prisoner's petition for writ of habeas corpus and should order the Board to vacate its decision denying parole and thereafter to proceed in accordance with due process of law." (*Rosenkrantz, supra,* 29 Cal.4th at p. 658, italics added.)

*Rosenkrantz* repeatedly describes the "some evidence" standard as extremely deferential, which requires only a "modicum of evidence" to support the Board's denial of parole. (*Rosenkrantz, supra,* 29 Cal.4th at pp. 679, 677, italics omitted.) *Rosenkrantz* indicates that the reviewing court is not permitted to review the Board's weighing of the various circumstances indicating suitability or unsuitability for parole; the court should only determine whether the circumstances relied upon by the Board in determining unsuitability are supported by *some* evidence and whether the Board decided the defendant's case on an individualized basis. (*Id.* at pp. 626, 677.) "As long as [the Board's] decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the [Board's] decision."[3] (*Id.* at p. 677.) Further, "the precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the [Board]," and

---

[3] *Rosenkrantz, supra,* 29 Cal.4th 616, actually dealt with judicial review of the Governor's decision to override the Board's finding of suitability for parole, but the same standard of review applies to review of the Board's finding of unsuitability for parole. (*Id.* at pp. 660, 667.)

"[r]esolution of any conflicts in the evidence and the weight to be given the evidence are within the authority of the Board. [Citation.]" (*Id.* at pp. 677, 656.) Thus, the reviewing court must defer to the Board's interpretation of the evidence.[4] Further, as the court in *Rosenkrantz* explained, "It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole." (*Rosenkrantz*, at p. 677; accord, *In re Elkins* (2006) 144 Cal.App.4th 475, 492 [50 Cal.Rptr.3d 503].)

The *Rosenkrantz* court elaborated upon this extremely limited review, stating, "As the United States Supreme Court explained in a related context: 'Requiring a modicum of evidence to support a decision [to deny parole] will help to prevent arbitrary deprivations without threatening institutional interests or imposing undue administrative burdens. In a variety of contexts, the [United States Supreme] Court has recognized that a governmental decision resulting in the loss of an important liberty interest violates due process if the decision is not supported by *any* evidence [Citations.]' [Citation.] 'Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is *any* evidence in the record that could support the conclusion reached by [the Board]. [Citations.]' " (*Rosenkrantz, supra*, 29 Cal.4th at pp. 664–665, first italics added, citing *Superintendent v. Hill, supra*, 472 U.S. at pp. 455–456.)[5]

The court thus specifically recognizes that the standard of review is not to impose undue administrative burdens. The Board's hearings must be reviewed in context: they are neither trials nor full-blown evidentiary hearings. "Although principles of due process apply, the parole authority is not required to proceed with the formality required of courts. [Citation.]" (*In re Morrall* (2002) 102 Cal.App.4th 280, 294 [125 Cal.Rptr.2d 391] (*Morrall*).) As the court explained in *Rosenkrantz*, "prior decisions characterize proceedings before the Board as informal, in contrast to judicial or formal administrative proceedings." (*Rosenkrantz, supra*, 29 Cal.4th at p. 654; see also *Pope v.*

---

[4] Where the facts presented at the hearing would support two different interpretations, the Board's interpretation must be deferred to. As the court explained in *Superintendent v. Hill*, "The Federal Constitution does not require evidence that logically precludes any conclusion but the one reached by the . . . board. Instead, due process in this context requires only that there be some evidence to support the findings made in the . . . hearing." (*Superintendent v. Hill, supra*, 472 U.S. at p. 457.) Thus only if the record is "devoid of evidence" so that the Board's interpretation or conclusion is "without support or otherwise arbitrary," is due process implicated. (*Ibid.*)

[5] The Board must make an individualized decision as to each prisoner, and if it fails to consider circumstances which would point toward suitability for parole, due process may be violated. (See, e.g., *Rosenkrantz, supra*, 29 Cal.4th at p. 677.) The majority, however, does not contend that the Board here failed to consider all the evidence, including that which would have supported a finding of suitability for parole.

*Superior Court* (1970) 9 Cal.App.3d 636, 641 [88 Cal.Rptr. 483] [Adult Authority not limited to rules of evidence applicable in judicial proceedings; Authority not required to proceed with formality required of courts]; accord, *In re Spence* (1974) 36 Cal.App.3d 636, 639–640 [111 Cal.Rptr. 782].) For example, the California Supreme Court has previously held that a prisoner is not entitled to the same type of evidentiary hearing regarding parole suitability as is mandated when he is faced with revocation of his parole, and has therefore declined "to hold *Morrissey*[6] directly applicable" to parole suitability hearings. (*In re Sturm* (1974) 11 Cal.3d 258, 266 [113 Cal.Rptr. 361, 521 P.2d 97] (*Sturm*).) As the court explained, "[T]here are valid reasons for a distinction between revocation and release. In *Morrissey* the court recognized that revocation of parole involves the loss of a parolee's conditional liberty, whereas parole release decisions concern an inmate's mere anticipation or hope of freedom [citation]. Furthermore, a parole release proceeding is an attempt to predict by subjective analysis whether the inmate will be able to live in society without committing additional antisocial acts; in contrast, a revocation hearing involves a specific charge of out-of-prison misconduct which commends itself to quasi-judicial resolution. [Citations.]" (*Sturm, supra*, at p. 266; accord, *In re Arafiles* (1992) 6 Cal.App.4th 1467, 1480 [8 Cal.Rptr.2d 492].) However, the prisoner does have a right to be free from an arbitrary parole suitability decision. (*Rosenkrantz, supra*, 29 Cal.4th at p. 655 ["In *Sturm, supra*, 11 Cal.3d 258, we found in prior California decisions 'a limited cognizance of rights of parole applicants to be free from an arbitrary parole decision, to secure information necessary to prepare for interviews with the [Board], and to something more than mere pro forma consideration.' [Citation.]"].)

While the Board's findings must state the circumstances it relies upon in deeming a prisoner unsuitable for parole and must be in writing, the Board need not detail facts in the record that support those circumstances. (See *In re Lawrence* (2007) 150 Cal.App.4th 1511, 1575–1576 [59 Cal.Rptr.3d 537] (dis. opn. of Perluss, P. J.) (*Lawrence*) ["Neither the due process clause nor the governing statutes obligates the Governor to provide a detailed written analysis of each parole suitability factor. [Citations.]"]; *In re Elkins, supra*, 144 Cal.App.4th at p. 490 [nothing in due process concepts requires Board to specify particular evidence in inmate's file or at his interview on which it rests discretionary determination that inmate not ready for conditional release (citing, cf. *Greenholtz v. Nebraska Penal Inmates* (1979) 442 U.S. 1, 15 [60 L.Ed.2d 668, 99 S.Ct. 2100])].) The Board may use the language of the governing statutes and regulations in its decision. (*Dang v. Ornoski* (N.D.Cal., Oct. 24, 2006, No. C05-4254SI) 2006 WL 3041096 at p. *8 [for legal reasons, decision makers often use boilerplate language].) As the court recently explained in *In re Fuentes* (2005) 135 Cal.App.4th 152, 162 [37

---

[6] *Morrissey v. Brewer* (1972) 408 U.S. 471 [33 L.Ed.2d 484, 92 S.Ct. 2593].

Cal.Rptr.3d 426] (*Fuentes*), "The trial court believed the Board used the statutory language in 'an attempt to justify an arbitrary decision to deny parole,' rather than engaging in a 'reasoned consideration' of the relevant factors. To the extent the court placed any weight on the Board's use of the phrase 'cruel manner' rather than the word 'egregious,' the court erred; both have similar meanings and may be used interchangeably. Nor do we find any significance to the Board's use of any other language contained in the regulation to describe its findings about the commitment offense." (See also *Lawrence*, *supra*, 150 Cal.App.4th at p. 1569, fn. 6 (dis. opn. of Perluss, P. J.) [use of language " 'especially atrocious, heinous or callous' " reflects not rote hyperbole, but fact that governing regulations expressly provide crime committed in such a manner indicates unsuitability].) So long as the record contains a modicum of evidence supporting the circumstances the Board relies upon, its decision comports with due process.

In sum, "the 'some evidence' standard is extremely deferential and reasonably cannot be compared to the standard of review involved in undertaking an independent assessment of the merits or in considering whether substantial evidence supports the findings underlying [the Board's] decision." (*Rosenkrantz*, *supra*, 29 Cal.4th at p. 665.) We should not scour the entire record looking for evidence contrary to the Board's decision, independently assess the credibility of witnesses, or reweigh the evidence; we are neither deciding the issue of suitability of parole de novo, nor are we even reviewing the Board's decision to determine if it is supported by substantial evidence.

*Regulations Governing Determination of Suitability*

As indicated by the majority, the circumstances to be considered by the Board in determining whether a prisoner is suitable for parole, or if his release would pose an unreasonable risk of danger to society, are set forth in California Code of Regulations, title 15, section 2402, subdivisions (c) and (d).[7] As explained in detail in *Rosenkrantz*, *supra*, 29 Cal.4th 616, "According to the applicable regulation, circumstances tending to establish unsuitability for parole are that the prisoner (1) committed the offense in an especially heinous, atrocious, or cruel manner; (2) possesses a previous record of violence; (3) has an unstable social history; (4) previously has sexually assaulted another individual in a sadistic manner; (5) has a lengthy history of severe mental problems related to the offense; and (6) has engaged in serious misconduct while in prison. [Citation.] [¶] The regulation further provides that circumstances tending to establish suitability for parole are that the prisoner: (1) does not possess a record of violent crime committed while a juvenile; (2) has a stable social history; (3) has shown signs of remorse;

---

[7] All further section references are to title 15 of the California Code of Regulations, unless otherwise specified.

(4) committed the crime as the result of significant stress in his life, especially if the stress has built over a long period of time; (5) committed the criminal offense as a result of battered woman syndrome; (6) lacks any significant history of violent crime; (7) is of an age that reduces the probability of recidivism; (8) has made realistic plans for release or has developed marketable skills that can be put to use upon release; and (9) has engaged in institutional activities that indicate an enhanced ability to function within the law upon release. [Citation.]" (*Rosenkrantz, supra*, at pp. 653–654, fn. omitted.) These regulations are set forth only as general guidelines and " 'the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel.' " (*Id.* at p. 654.) In reviewing the Board's decision, the court may determine only whether some evidence in the record supports the circumstances relied upon by the Board in finding unsuitability and "[i]f the decision's consideration of the specified factors is not supported by some evidence in the record and thus is devoid of a factual basis, the court should grant the prisoner's petition for writ of habeas corpus . . . . [Citations.]" (*Id.* at p. 658; see § 2402, subds. (c), (d).)

*Review of the Board's Finding of Roderick's Unsuitability for Parole*

Although not a model of clarity, the Board's finding of unsuitability in the present case appears to have been based on five circumstances: (1) the commitment offense; (2) the prisoner's social history; (3) the prisoner's past and present attitude toward the commitment offense; (4) the prisoner's institutional behavior; and (5) the prisoner's prior criminal history. The majority concludes that only the last of these circumstances, the prisoner's criminal history, was supported by any evidence in the record, and that this "immutable" factor may not be a sufficient basis for denial of parole. To the contrary, the record does show *some* evidence supports each of the circumstances relied upon by the Board in finding that release of the prisoner would pose an unreasonable risk to public safety.

(1) *Commitment Offense*

If the prisoner committed the offense in a particularly atrocious, cruel, or heinous manner, that circumstance tends to establish unsuitability for parole. (§ 2402, subd. (c)(1).) As explained in *Rosenkrantz, supra*, 29 Cal.4th at page 653, footnote 11, "Factors that support a finding that the prisoner committed the offense in an especially heinous, atrocious, or cruel manner include the following: (A) multiple victims were attacked, injured, or killed in the same or separate incidents; (B) the offense was carried out in a dispassionate and calculated manner, such as an execution-style murder; (C) the victim was abused, defiled, or mutilated during or after the offense; (D) the offense was

carried out in a manner that demonstrates an exceptionally callous disregard for human suffering; and (E) the motive for the crime is inexplicable or very trivial in relation to the offense. [Citation.]"

The majority disagrees with the Board's determination that the nature of the commitment offense weighed in favor of unsuitability. It criticizes the Board for not specifically relying upon the language of section 2402, subdivision (c)(1) (that the crime was committed in an especially heinous, atrocious, or cruel manner) in its findings, and for not specifically referencing the factors set forth in section 2402, subdivision (c)(1)(A)–(E) that the Board is directed to consider in making such a determination, citing *In re DeLuna* (2005) 126 Cal.App.4th 585, 593–594 [24 Cal.Rptr.3d 643]. It further concludes that a finding the Board did specifically make, that the prisoner had opportunities to avoid the commission of the murder but failed to do so, was neither supported by the evidence, nor properly relied upon by the Board. I disagree on all points.

The Board did indicate that it was relying on the circumstances of the commitment offense. The only circumstance listed in section 2402, subdivision (c) that relates to the commitment offense is subdivision (c)(1)— that the crime was committed in an especially heinous, atrocious, or cruel manner. We can infer, therefore, that the Board was relying upon section 2402, subdivision (c)(1) when it spoke to the circumstances of the commitment offense. While the Board is required to state in its written findings the circumstances it is relying upon to find the prisoner unsuitable for parole, under section 2402, subdivision (c), it is unclear whether the Board is additionally required to set forth in its findings the factors that the Board is directed to consider in making that determination as set forth in section 2402, subdivision (c)(1)(A)–(E).[8] Assuming for the sake of argument, however, that the Board is required to further elaborate in some fashion in its decision upon the factors that it considered in determining that the crime was especially atrocious, cruel, or heinous, that requirement was adequately met here. Although the Board did not use the language of the enumerated factors specifically,[9] it did indicate in its findings that it was basing its decision to deny parole in part on the nature of the commitment offense. The Board, relying upon the summary of the offense in the probation report, then explained that the offense arose out of a verbal disagreement inside a bar that Roderick escalated into a physical altercation, culminating in the death of the victim due to knife wounds inflicted by Roderick.

---

[8] Penal Code section 3042, subdivision (c) requires that the Board state its findings "and supporting reasons" on the record.

[9] See, e.g., *Fuentes, supra,* 135 Cal.App.4th at page 162 (failure to use exact language of factor not fatal).

According to the probation report's summary of the witness accounts, the bartender told the victim and Roderick to take their fight (to this point only a verbal disagreement) outside. Roderick punched the victim in the face as they were going out the door; the victim staggered back and fell against the tables near the jukebox. The victim was dazed, stumbled around, and started to head out the door again. As the victim came out the door, Roderick punched him again. The altercation continued outside and "in a few seconds it was reported that the victim had been stabbed." The victim died of knife wounds to the chest. Roderick fled the scene and was apprehended a short distance away. In its findings, the Board noted that according to Roderick, the verbal altercation inside the bar began when the victim confronted him because Roderick's daughter (a security officer for Safeway) had arrested the victim's aunt for shoplifting.

The Board then focused on the opportunities that Roderick had to defuse the developing confrontation, to not escalate it into a physical altercation, and to hence avoid murdering the victim, stating, "And there are a lot of other choices that you could have made, Mr. Roderick. You could have just left. You could have just gone home. You could have called the police. But that wasn't the choice that you made." Although not phrased in the exact language of section 2402, subdivision (c)(1)(E), the Board considered Roderick's motive for committing the crime (that the offense arose from a verbal disagreement in a bar, that Roderick escalated it into a physical altercation that ultimately resulted in Roderick killing the victim by inflicting multiple knife wounds, and that he could have avoided committing the crime), and impliedly found it to be trivial.[10] Thus, even if we are not able to rely upon factors the Board is directed to consider under section 2402, subdivision (c)(1)(A)–(E), which are supported by the record but were not relied upon by the Board in denying parole (*In re DeLuna, supra,* 126 Cal.App.4th at pp. 593–594), here it appears that the Board did in fact rely upon the prisoner's trivial motivation for committing the crime.

The majority indicates that "[t]he motive for the killing was not inexplicable or trivial in its context" and concludes that "in this case there is no evidence to support a finding that the motive for the murder was less significant *than in other second degree murder cases.*" (Maj. opn., *ante,* at p. 266, italics added.) The majority relies on *Scott I, supra,* 119 Cal.App.4th at page 894 to support its position that the prisoner's motive for committing the crime should be compared to that in other second degree murders. If this was

---

[10] The court in *Fuentes* similarly relied in part upon the prisoner's opportunity to avoid the commission of the crime in determining that his motive was trivial, stating, "Fuentes easily could have avoided any confrontation by going into his friend's house instead of continuing to walk with Luken. Fuentes's participation was thoughtless. His motive was inexplicable or trivial." (*Fuentes, supra,* 135 Cal.App.4th at p. 163.)

ever the correct test, it certainly can no longer be considered accurate in light of the California Supreme Court's holding in *In re Dannenberg* (2005) 34 Cal.4th 1061 [23 Cal.Rptr.3d 417, 104 P.3d 783] (*Dannenberg*). The *Scott I* decision imports limitations upon the factors underlying the Board's determination that the commitment crime was committed in an especially heinous, atrocious, or cruel manner (including the consideration of whether the motive was trivial) that the court specifically rejected in *Dannenberg*. The majority in *Scott I*, for example, found that "to demonstrate 'an exceptionally callous disregard for human suffering' (§ 2402, subd. (c)(1)(D)), the offense in question must have been committed in a more aggravated or violent manner *than that ordinarily shown in the commission of second degree murder.*" (*Scott I, supra*, 119 Cal.App.4th at p. 891, italics added.) This requirement of a comparative analysis with other second degree murders is carried over into its analysis of the underlying factor of whether the motive for the crime was trivial.

Justice Haerle in his dissenting opinion in *Scott I* best sets forth why this comparative analysis approach was, even at the time of *Scott I*, improper. "The majority, in frankly the least convincing part of its opinion, effectively substitutes its opinion for that of the Board, and does so by the tactic of setting up a patently false premise, to wit: 'The reference in Board regulations to motives that are "very trivial in relationship to the offense" therefore requires comparisons; to fit the regulatory description, the motive must be materially less significant (or more "trivial") than those which conventionally drive people to commit the offense in question . . . .' [Citation.] This requirement of comparisons with other second degree murders is, purely and simply, an invention out of the proverbial whole cloth. Not a sentence, not a phrase, not a word in the Board's regulations suggest that, at the parole-eligibility stage, the motives underlying Penal Code section 187 convictions are, much less should be, subject to any sort of comparison test. But such is what the majority then embarks on—complete with quotations from several abstract academic musings regarding criminal motive. It concludes that the Board erred in finding that 'Scott's motive for killing Bradford is less significant or important than others which account for the commission of second degree murder . . . .' [Citation.] [¶] The majority's discursive venture into the exquisitely abstruse issue of comparative second degree murder motivations ignores the real issue. The only comparison the Board was making, or indeed was entitled to make, was that Scott's motive for his actions was 'trivial' in relationship to the crime which resulted . . . ." (*Scott I, supra*, 119 Cal.App.4th at pp. 902–903 (dis. opn. of Haerle, J.).)[11] That

---

[11] Justice Haerle goes on to note that there were an infinite variety of actions short of murder that Scott could have taken to "diminish, deflect, defeat or even punish the victim's despicable conduct short of murder." (*Scott I, supra*, 119 Cal.App.4th at p. 903 (dis. opn. of

Justice Haerle's analysis was correct appears clear after the Supreme Court's ruling in *Dannenberg, supra,* 34 Cal.4th 1061.

In *Dannenberg* the court was faced with the issue of whether the Board had to evaluate the prisoner's case under standards of term uniformity before exercising its authority to deny parole on the grounds that the prisoner's criminality presented a continuing public danger. The court determined that the Board need not do such a uniformity evaluation before determining suitability for parole. In reaching this conclusion, the court discussed its prior opinion in *Rosenkrantz, supra,* 29 Cal.4th 616, quoting from that opinion as follows: "we suggested that, in order to prevent the parole authority's case-by-case suitability determinations from swallowing the rule that parole should 'normally' be granted, an offense must be 'particularly egregious' to justify the denial of parole." (*Dannenberg, supra,* 34 Cal.4th at p. 1095.) The Governor in *Rosenkrantz* had relied upon circumstances of the prisoner's offense that involved particularly egregious acts " 'beyond the minimum necessary to sustain a conviction for second degree murder,' " and " '[a]ccordingly, the Governor properly could consider the nature of the offense in denying parole.' " (*Ibid.*) The court noted that "*Rosenkrantz* did not say the parole authority must routinely subordinate suitability to uniformity . . . or otherwise engage in a comparative analysis of similar offenses before deeming a particular life inmate unsuitable . . . . Our discussion, including our use of the phrase 'particularly egregious,' conveyed only that the violence or viciousness of the inmate's crime must be more than *minimally necessary to convict him* of the offense for which he is confined." (*Ibid.,* original italics.) Further, the *Dannenberg* court, in evaluating whether the facts of that commitment crime were particularly egregious, found that the crime was " 'especially callous and cruel,' showed 'an exceptionally callous disregard for human suffering,' and *was disproportionate to the 'trivial' provocation.' *" (*Ibid.,* italics added.) Thus the motive for committing the crime in *Dannenberg* was evaluated not by comparing it to the motive in other murders, but as suggested by Justice Haerle in his dissent in *Scott I,* by comparing it to the crime committed. Indeed, that method of comparison would appear to be the only appropriate one, given the specific language of section 2402, subdivision (c)(1)(E), which directs the Board to consider whether "[t]he motive for the crime is inexplicable or very trivial *in relation to the offense*" in determining whether the prisoner committed the crime in an especially heinous, atrocious, or cruel manner. (Italics added.)

The court recognized in *In re Scott* (2005) 133 Cal.App.4th 573, 598 [34 Cal.Rptr.3d 905] (*Scott II*) that *Dannenberg, supra,* 34 Cal.4th 1061, and *Rosenkrantz, supra,* 29 Cal.4th 616, require that the commitment offense be

---

Haerle, J.).) As in the present case, the failure of Scott to avoid the commission of the crime goes to his trivial motive for committing it.

compared to the minimal elements necessary for conviction, as opposed to the court engaging in a comparative analysis with other second degree murders, in determining its egregiousness. In conducting that analysis, however, the court compared the facts of Scott's commitment offense with the facts of the commitment offenses in three other published cases. Other reviewing courts appear to have similar difficulty fully escaping from the incorrect method of comparative analysis and continue to engage in improper comparisons with other similar offenses. For example, the majority in *Lawrence* also compares the commitment crime to similar offenses in other published cases, stating, "Turning to [the] offense, it is hard to characterize what Lawrence did as more 'atrocious,' 'heinous,' 'callous,' or committed with more 'extreme lethality' than most of the other murders described above in which our fellow appellate courts found they failed as 'some evidence' supporting a Board or gubernatorial denial of parole." (*Lawrence, supra*, 150 Cal.App.4th at p. 1556.)

By this approach, employing an ordinary method of legal analysis by comparing the facts of the current offense to the facts in other published opinions, a line of cases is developing wherein reviewing courts accomplish through the back door that which they are forbidden to do directly. These cases compare their commitment crime with the facts of prior published cases that found the circumstances of the commitment crime not to be sufficiently egregious, declare their commitment crime to not be as egregious as the facts in those published opinions, and thereby conclude that the facts of their commitment offense are not egregious enough to weigh in favor of unsuitability for parole. Of course, to the extent the earlier cases incorrectly conducted a comparative analysis, the subsequent reliance on that comparison becomes suspect; the entire line of case authority thus potentially becomes a house of cards. This method of comparing the current commitment crime to the facts in other cases, in this context, subtly employs the improper method of comparing the facts of the commitment offense to other similar offenses, rather than simply comparing it to the minimal elements of the offense. As Presiding Justice Perluss correctly explains in his dissent in *Lawrence*, "[U]tilizing a variant of the comparative analysis rejected in a related context by *Dannenberg* . . . the majority simply asserts it is hard to characterize Lawrence's crime as 'more "atrocious," "heinous," "callous," or committed with more "extreme lethality" than most of the other murders described' in other appellate decisions discussed by the majority. [Citation.] That, of course, is not the proper question for us to address in deciding whether, in the exercise of extremely deferential review, to overturn the Governor's decision to reverse the Board's grant of parole." (*Lawrence, supra*, 150 Cal.App.4th at pp. 1568–1569, fn. omitted (dis. opn. of Perluss, P. J.).)

Another example of deviation from the correct method of comparison occurred in the recent case of *In re Barker* (2007) 151 Cal.App.4th 346, 373

[59 Cal.Rptr.3d 746] (*Barker*). There the court stated, "Barker's petition appropriately concedes that [his friend's] grandfather did suffer until he was shot, but goes on to assert that the murder was no 'more callous, dispassionate, calculated, cruel or committed with more disregard for suffering *than most such offenses.*' Without in any way minimizing the severity of Barker's crimes, *we agree with this argument.* [Citation.]" (*Ibid.*, italics added.) As authority for this position, the *Barker* court quotes *Scott I, supra,* 119 Cal.App.4th at page 891: " 'the offense in question must have been committed in a more aggravated or violent manner than that ordinarily shown in the commission of . . . murder.' " (*Barker, supra,* at p. 373.) As previously indicated, even *Scott II* recognizes that after *Dannenberg, supra,* 34 Cal.4th 1061, this method of comparison is no longer appropriate. (*Scott II, supra,* 133 Cal.App.4th at p. 598.) The court in *Barker* drifts back to the correct analysis, comparing the commitment crime to the minimal elements required for murder, but reaches the extraordinary conclusion that "But however horrific the murders, however horrific the outcome of Barker's participation, again it is difficult to discern how that participation can be considered anything other than the minimum for 'malice aforethought.' " (*Barker, supra,* at p. 373.) The *Barker* opinion also harkens back to *Scott I*'s incorrect analysis regarding the motivation for the crime, indicating that " 'the motive must be materially less significant (or more "trivial") *than those which conventionally drive people to commit the offense in question* . . .' " rather than properly comparing the motive to the particular circumstances of the commitment crime. (*Barker, supra,* at p. 374, italics added.) Undoubtedly some future cases will compare the facts of their commitment crimes to the fairly egregious facts in *Barker*, declare the facts of their cases to be less egregious than the *Barker* facts, and conclude that their cases are therefore not sufficiently grave to weigh in favor of unsuitability. For the reasons indicated *ante,* these types of comparative analyses are inappropriate. Applying the correct analysis here, Roderick's motive for committing the murder was trivial when compared to the crime committed, killing the victim by inflicting multiple knife wounds.

The majority, relying upon *Barker*, opines that "few—if any—motives would *not* be trivial relative to the kind of findings that are required to convict on first or second degree murder." (Maj. opn., *ante,* at p. 266, original italics.) Indeed the language relied upon by the majority from *Barker* states, " 'Given the high value our society places upon life, there is no motive for unlawfully taking the life of another human being that could not reasonably be deemed "trivial." ' " (*Barker, supra,* 151 Cal.App.4th at p. 374.) This analysis ignores the fact that the governing regulations specifically direct the Board to consider whether "[t]he motive for the crime is inexplicable or very trivial in relation to the offense." (§ 2402, subd. (c)(1)(E).) If properly evaluated, the motive would be compared to the circumstances of the

commission of the underlying offense, and if it was trivial in comparison to the crime committed, that would support a finding that the commitment crime was egregious.

Even if the Board in the present case did not generally rely upon Roderick's motive for committing the crime, at the very least it specifically relied upon Roderick's missed opportunities to defuse the situation and avoid the escalation which led to the murder. The majority opines, however, that it was inappropriate for the Board to consider these missed opportunities to avoid committing the crime, as that is not a specifically enumerated factor under section 2402, subdivision (c)(1)(A)–(E). The factors listed there, however, should not be considered all inclusive and are intended as guidelines to, rather than limitations upon, the types of factors that the Board can consider in determining whether the offense was carried out in an especially heinous, atrocious, or cruel manner. As the court explained in *Dang v. Ornoski, supra*, 2006 WL 3041096 at p. *7, "the list of circumstances in section 2402(c) is non-exclusive, and section 2402(b) specifically allows the [Board of Prison Terms] to consider a great range of relevant and reliable information . . . ." (Accord, *Paluzzi v. Kane* (N.D.Cal., Oct. 23, 2006, No. C06-801SI) 2006 WL 3020919 at p. *6 [the list of circumstances in section 2402, subdivision (c) is nonexclusive]; *Elkins v. Brown* (N.D.Cal., Dec. 21, 2006, No. C05-1722MHP) 2006 WL 3782892 at p. *7 [same].)

Similarly, the factors enumerated in section 2402, subdivision (c)(1)(A)–(E) should not be read to limit the Board's discretion in determining whether a crime was committed in an especially heinous, atrocious, or cruel manner. The language of the regulation itself supports this interpretation. (§ 2402, subd. (c)(1) ["The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered *include*: [¶] (A) Multiple victims were attacked, injured or killed in the same or separate incidents."]; *Rosenkrantz, supra*, 29 Cal.4th at p. 653, fn. 11 ["Factors that support a finding that the prisoner committed the offense in an especially heinous, atrocious, or cruel manner *include* the following . . . ." (Italics added).].) Indeed *In re Morrall* reached exactly that conclusion, indicating that the factors listed in section 2402, subdivision (c)(1)(A)–(E) to be considered in determining if the crime was carried out in an especially heinous, atrocious, or cruel manner, are nonexclusive. (*Morrall, supra*, 102 Cal.App.4th at p. 301.)

In *In re Smith* (2003) 114 Cal.App.4th 343, 368 [7 Cal.Rptr.3d 655], the fact that the petitioner had an opportunity to stop the crime but continued on with it, along with several other facts about the manner in which the crime was committed, was relied upon as supporting a finding that the crime was particularly egregious. There was some evidence in the record to support the

Board's similar conclusion in the present case. There is evidence that Roderick killed the victim by inflicting multiple knife wounds, with a trivial motive, and that he had opportunities to prevent the crime from occurring. Just as in *Smith*, this is *some* evidence supporting the Board's finding that the circumstances of the commitment offense weighed against suitability for parole.

The majority relies, in part, upon Roderick's account that it was the victim who initially pulled the knife on him, in concluding that the motive for the crime was not less significant than in other cases. (Maj. opn., *ante*, at p. 266.) Other than defendant's account of the crime, which both the investigating officer[12] and the district attorney indicated conflicted with both physical evidence and witness accounts, and which was apparently rejected by the jury, there was no indication that the victim initiated the physical altercation, or that he initially had the knife. (See *Paluzzi v. Kane, supra,* 2006 WL 3020919 at p. *6 [district attorney's statement could not be independent basis for denying parole, but was relevant in countering petitioner's characterization of killing].)

According to Roderick's statement to the probation officer, and apparently his testimony at trial, the victim was armed with the knife and pulled it on Roderick. A struggle ensued, and Roderick was able to get control of the knife. Roderick claimed that he stabbed the victim with the knife in self-defense as the victim kept trying to throw Roderick down, and that was when the fatal wound was administered. Had the jurors accepted Roderick's version of the events, they would have either acquitted him (if they believed that he was acting in self-defense) or found him guilty of manslaughter (if they believed he acted in an honest, but unreasonable need to defend or in the heat of passion). Because jurors convicted him of second degree murder, it appears they rejected his story. The majority unreasonably carves out one small part of Roderick's account, that the victim initially had the knife, concludes that the jury believed that (but nothing else that Roderick said), and relies upon that version of the events. A more reasonable conclusion is that the jury rejected the entirety of Roderick's version of the events, including who initially had the knife.[13]

In any event, the interpretation of the facts, and the weight to be given to the circumstances of the offense, are matters for the Board's determination. As the court indicated in *Rosenkrantz, supra,* 29 Cal.4th at page 679,

---

[12] The investigating officer's statement in this regard was made to the probation officer and is included in the probation report.

[13] There were inconsistencies between Roderick's account of the commitment offense at the 2005 parole hearing and the limited information regarding witness accounts that is contained in the probation report, as well. (See p. 297, fn. 21, *post.*)

"Although the [Board] is required to consider whether the prisoner committed the crime as the result of significant stress in his or her life, the importance attached to this circumstance is left to the judgment of the [Board] . . . . [O]ur inquiry strictly is limited to whether some evidence supports the [Board's] assessment of the circumstances of petitioner's crime—*not whether the weight of the evidence conflicts with that assessment or demonstrates that petitioner committed the offense because of extreme stress.*" (Italics added.)

The majority concludes that "[t]o state that a defendant 'could have just left' or 'could have just gone home' says nothing more than the defendant could have chosen not to pick the fight or mortally wound his victim; these facts do not describe the *manner* in which the murder was committed.' " (Maj. opn., *ante*, at p. 267, original italics.) That may be true, but the same could be said regarding one's motive to commit the crime, and yet section 2402, subdivision (c)(1)(E) indicates that a trivial motive for committing the crime *is* a factor to consider in determining the gravity of the offense. Again, the opportunity to avoid a crime goes to the motive for committing it; even if it does not, however, the Board is not restricted from considering factors other than those specifically enumerated in determining the gravity of the commitment offense.

While I agree with the majority that the manner in which the commitment crime here was carried out was not otherwise heinous, atrocious, or cruel, there was evidence that the victim died from multiple knife wounds inflicted by Roderick, that the motive for the commitment offense was trivial in comparison to the crime committed, and that Roderick ignored opportunities to avoid committing the crime. There was, therefore, some evidence to support the Board's reliance upon the gravity of the offense, and its implied finding that it was more egregious than required by the minimal elements of second degree murder. However, the Board did not rely on the nature of the commitment crime alone in finding Roderick unsuitable for parole, and indeed this circumstance did not appear to be the primary focus of its findings.[14]

(2) *The Prisoner's Social History*

Again, although not articulately stated, the Board relied upon Roderick's unstable social history.[15] Section 2402, subdivision (c)(3) indicates that an

---

[14] Although not specifically addressed in the section of the majority opinion discussing the commitment offense, the propriety of reliance upon such "immutable factors" is raised by the majority in its discussion of Roderick's prior criminal history, and is therefore similarly addressed, *post*, at pp. 307–310.

[15] The Board stated, "His unstable social history is certainly related to that criminal history but also to the abuse of alcohol."

unstable social history (a history of unstable or tumultuous relationships with others) is a circumstance tending to show unsuitability for parole. There is some evidence in the record to support this circumstance.

The record indicates that Roderick was raised by his paternal grandmother after his parents' divorce (when he was an infant), that he never had contact with his estranged mother until he was 16 (although she lived within 40 miles of his home), and that he never established a relationship with her. Roderick stated at the parole hearing that he also never had a relationship with his father, because he did not care for his stepmother. Roderick dropped out of high school after the 11th grade. His first marriage ended in divorce after three years. Additionally, as specifically referenced by the Board, Roderick's extensive criminal history and abuse of alcohol are also indicative of an unstable social history. Factors such as the prisoner's criminal history, dropping out of high school, and drug abuse have been found to support reliance upon the unstable social history circumstance in finding unsuitability. In *Robles v. Solis* (N.D.Cal., Oct. 12, 2006, No. C04-2529CRB) 2006 WL 2934086 (*Solis*), the court relied upon the petitioner's street-gang lifestyle, resulting in multiple juvenile arrests, and the fact that petitioner was on probation at the time of the commitment offense, as showing an unstable social history. (*Id.* at p. *3.) In *Dang v. Ornoski, supra,* 2006 WL 3041096 at pp. *6–*7, the Board properly relied upon the prisoner's dropping out of high school, running away, and joining a gang as indicative of an unstable social history, despite his unfortunate history as a Vietnamese refugee. In *Elkins v. Brown, supra,* 2006 WL 3782892 at p. *7, the court similarly found that the Board properly relied upon the prisoner's limited past criminal history and drug abuse as indicating an unstable social history. (Accord, *Paluzzi v. Kane, supra,* 2006 WL 3020919 at p. *6 [prisoner's past drug abuse and past poor family relationships (although now healed) provide some evidence supporting unstable social history].)

There are also facts in the record that could arguably indicate that Roderick has had some stable social relationships. First, he was married for 20 years, although he was divorced long before the commitment offense. He spent much of those 20 years behind bars, a fact that could be argued to either show a very stable relationship that endured despite forced separation, or which could be argued to lessen the value of this long-term marriage as indicative of stable social relationships that would prevent the prisoner from reoffending in the future. His crimes during this period were numerous and included not only several alcohol-related offenses (indicating abuse of alcohol), but also felonies and crimes of violence. Additionally, one of his arrests during this time period was for vagrancy. (Pen. Code, § 647.6.)

Roderick has an adult daughter, Angela Stapp, who has offered him a place to reside after he is paroled. Ms. Stapp was 21 years old when the probation

report was prepared in 1985. Again, this relationship might be seen as a stable social relationship were it not for the fact that Roderick spent many of the years that Ms. Stapp was growing up either in jail or state prison, where of course he has also spent the last 20 years. While it could be argued that her support of her father indicates a stable social relationship that has survived their years of separation, it could also be argued that Roderick's daughter never really had the opportunity to have any relationship with her father, much less a stable one. Given Roderick's criminality and alcoholism during the pertinent periods of time, neither his relationship with his ex-wife, nor his relationship with his daughter, is the type of stable social relationship that has predictive value, that is, neither relationship would indicate that Roderick would be able to function in society without returning to his old ways.

In any event, the fact that there was evidence that might arguably indicate that Roderick might have some "stable" social relationships does not negate the evidence that he did not have an overall stable social history. Applying the correct standard of review, while there was evidence to support a contrary conclusion, there was some evidence in the record that Roderick's social history was not stable.[16] The Board's reliance on this factor was supported by a modicum of evidence in the record; nothing more is required. As noted previously, cases have relied upon a prisoner's past criminal history and drug abuse alone as indicative of an unstable social history. Here, there is ample evidence of both an extensive criminal history and severe alcohol abuse. These facts, along with the other indications of a lack of stable social history, support the Board's reliance on this circumstance. However, this circumstance also did not appear to be the primary basis of the Board's finding of unsuitability for parole.

### (3) *The Prisoner's Attitude Toward the Commitment Offense*

The Board also relied upon Roderick's attitude toward the commitment offense, pursuant to section 2402, subdivision (b), which indicates that the Board should consider the prisoner's past and present attitude toward the commitment offense. The Board specifically indicated that the prisoner needed "to develop insight into the impact of his criminal behavior and in particular, the impact of this crime where a man lost his life." Further, the Board found that the prisoner needed "to understand the underlying factors that led not only to this commitment offense, but also to his entire criminal history . . . ." This circumstance did appear to be one of the primary reasons the Board found Roderick unsuitable for parole.

---

[16] The majority concludes that "there is no evidence to support a finding that Roderick had difficult relationships with other prisoners and prison staff." (Maj. opn., *ante*, at p. 268.) I note that the record indicates Roderick was in fact involved in a physical altercation with his roommate, and was stabbed by him, in 1989.

One past psychological report (2003 report of E.W. Hewchuk, Ph.D.) indicated that Roderick "talked openly about the circumstances of the instant offense, and his comments reflect a new sense of insight into his incarceration. He is fully remorseful, and aware of the effect of his actions on the victim's family." In 1999, M.E. Carswell, Ph.D., stated that "[t]his inmate is very remorseful for causing the victim's family grief, and he is as sorry for taking this time away from his own family."[17] The majority relies upon these past reports in concluding that "[w]e see no evidence to support a conclusion that Roderick lacked insight into the *impact* of his criminal behavior or his commitment crime." (Maj. opn., *ante*, at p. 270, original italics.) The majority goes on to find that "Roderick provided a less than incisive explanation for his chronic criminality, but his responses also reflected acceptance of his alcoholism, acknowledgement of responsibility for his crimes, remorse, and shame."[18] (Maj. opn., *ante*, at p. 272.)

The inmate's responses to questions posed by the Board at the parole hearing, however, belie earlier indications in psychological reports of remorse and insight into his incarceration. When asked why his criminal history was so long,[19] Roderick replied, "Stupid is all I can tell you." Obviously responding negatively to the inmate's attitude as expressed in this answer, the Board pressed him further, asking, "Does that make sense to you?" Roderick replied that it did not. The Board then inquired, "What kind of answer is that?" Roderick replied, "I don't know." The Board then tried to get Roderick to express some reason for his long criminal history by asking if he committed the crimes because he thought it was exciting, and expressed that "I hear all kinds of reasons for criminal behavior and you just don't seem to know why you were doing it." Roderick replied, "It don't make sense, I'll agree with you." The Board then tried to lead the inmate into a possible explanation for his criminality, asking if he had a substance abuse problem, and Roderick admitted that he "was drinking." When asked if he was an alcoholic, Roderick replied, "Evidently were, I was drinking too much." The inmate expressed that he only drank when he was not working.[20] The Board

---

[17] Psychological evaluation reports over the years have treated Roderick's attitude toward the commitment offense differently. (See discussion, *post,* at pp. 301–302.)

[18] The majority concedes that Roderick has a limited capacity to understand or explain why he committed so many crimes in the past, but opines that his limitations are "a known quantity" that has been "factored into his risk assessment." (Maj. opn., *ante,* at p. 271.) The majority's opinion in this regard is discussed *post,* at pp. 301–302.

[19] The Board first inquired, "You were breaking the law in 1952, from 1952 until 1980. All through the '50's, all through the '60's, all through the '70's, you have criminal offenses. So, why?"

[20] Roderick's answers to questions regarding his alcohol problem could reasonably be interpreted to reflect both an attitude of indifference and an attempt to minimize his alcoholism. At the very least, they do not reflect a full admission by Roderick of his past and continuing addiction to alcohol and thus support the Board's determination that he had little

then asked again why Roderick committed all these crimes, if it was not to support a drug or alcohol problem, and since he had a family. Roderick could never articulate any reason why he led such a long life of crime, and he was unable to draw a connection between his alcoholism (which was quite extreme, given the number of alcohol-related crimes he was arrested for over the years) and his criminal history.

As to the commitment offense, Roderick indicated that the victim produced the knife initially, Roderick gained control over the knife, and then the victim was fatally injured during a struggle over the knife. This was apparently largely the same account of the crime that Roderick has repeated over the years during prior parole hearings, and which has been reiterated in psychological reports (including the 2005 report). Roderick did originally tell the probation department, and apparently testified at trial, that he stabbed the victim during a struggle over the knife, during which the victim kept trying to throw him down, and that he was acting in self-defense. The investigating officer told probation that this account of the crime was inconsistent with the physical evidence and witness accounts. Further, Roderick's claim of acting in self-defense was rejected by the jury. Roderick's testimony at the 2005 parole hearing, however, did not include a specific claim that he was acting in self-defense, but did include an admission that he intentionally stabbed the victim, without any real explanation as to why he did so.[21] The district attorney at the parole hearing argued that Roderick's account was inconsistent with the victim's injuries, the statements of the witnesses, and the verdict of the jury. As argued by the prosecutor at the parole hearing, Roderick still showed no remorse for the killing and still seemed to take the position that he had no choice but to kill the victim. (See *Paluzzi v. Kane, supra*, 2006 WL 3020919 at p. *6 [proper consideration of district attorney's argument].)

Roderick's attitude toward the current offense, both in terms of understanding why it occurred and showing remorse, as expressed at the parole hearing, was poor. The Board was present at the hearing and was able to evaluate Roderick's credibility, sincerity, and attitude. The Board was entitled to give the prisoner's own testimony, demeanor, and attitude more weight than it did past psychological reports.[22] We are not permitted to substitute our judgment

insight into this issue, despite his past participation in programs intended to address this problem. (See discussion, *post*, at pp. 299–300.)

[21] Roderick also insisted at this parole hearing that witness accounts that the stabbing occurred within seconds of his and the victim's leaving the bar were incorrect, and he testified to details of intervening circumstances. Additionally, Roderick claimed it was the victim who initiated the physical altercation by kicking him after they left the bar. This was also contradicted by the accounts given by other witnesses, which are included in the probation report.

[22] Indeed, some of the psychological reports contain factual inaccuracies. (See fns. 28 & 31, pp. 301, 302, *post*.)

on those issues for that of the Board. The fact that there is evidence in the record regarding this circumstance that would support a finding of suitability (the prior psychological reports) does not negate the evidence in this regard which supports a finding of unsuitability. "Resolution of any conflicts in the evidence and the weight to be given the evidence are within the authority of the Board." (*Rosenkrantz, supra*, 29 Cal.4th at p. 656.) We should not engage in an " 'examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is *any* evidence in the record that could support the conclusion reached by [the Board]. [Citations.]' [Citation.]" (*Id.* at p. 665, original italics.) In the present case, even though there may have been evidence in the record to the contrary, there was some evidence supporting the Board's determination that Roderick's attitude toward the commitment offense weighed in favor of unsuitability; that is all that is required.[23] The fact that the majority may read Roderick's responses differently is of no import under the deferential standard of review applicable here.

Finally, the majority recognizes that Board members, like trial judges, are in the best position to evaluate the credibility and attitude of the prisoner, and that we must defer to its judgment on those issues. The majority concludes, however, that "[i]t was only the content of Roderick's responses [not his attitude] that did not satisfy the Panel," citing the fact that the Board took him to task when it was upset with his attitude. (Maj. opn., *ante*, at p. 271, fn. 26.)[24] The portion of the record that the majority cites to in support of this position does little to bolster its conclusion. The comments by the Board member cited by the majority come from the prisoner's 1994 parole hearing, after the presiding commissioner had stated the ruling of the Board and turned to Deputy Commissioner Mar for any concluding comments. Mar remarked, "Yeah, I have one comment. Mr. Roderick, you've been in prison as long as I've worked in prisons, and what you give me in your appearance today is *a very nonchalant, indifferent attitude about your whole situation, about your life history and the crime*. And I'm really puzzled by the solution as to what can the State or what can you do to keep yourself out of prison, which I don't think you really care much about in or out of prison." (Italics added.) The fact that a Board member, at a hearing some 11 years before the hearing at issue here and with completely different Board members, specifically chose to take Roderick to task for his attitude does not indicate that Board members were not similarly impacted by Roderick's attitude in the 2005 hearing. Indeed, Mar's comments in 1994 would seem to pretty well

---

[23] This factor did appear to be one upon which the Board relied heavily in its determination that Roderick was not suitable for parole.

[24] Of course attitude may be expressed by the content of one's answers to questions, as well as by body language and tone of voice, etc.

summarize the Board's conclusions in 2005. A fair reading of the 2005 hearing transcript reveals that the Board was frustrated with Roderick's attitude toward his criminal history, the commitment crime, and his "programming" in state prison.

### (4) *Prisoner's Institutional Behavior*

The Board also relied heavily upon Roderick's institutional behavior in denying parole, finding: "During his incarceration, Mr. Roderick has programmed in a very limited manner. He's failed to upgrade either vocationally or educationally and has not yet sufficiently participated in beneficial self-help. He has had only one 128(a) counseling Chrono and that was back in 1991. And has had three serious 115 disciplinarians and the last one was back in 1993 and that was for marijuana." The majority dismisses these findings, indicating, "The Panel's 'find[ing]' that Roderick is in need of additional 'programm[ing]' as well as vocational and educational 'upgrade[s],' is without support in the record, and there is not a scintilla of evidence that would support the conclusion that these findings demonstrate Roderick's release would constitute an unreasonable risk to public safety." (Maj. opn., *ante*, at p. 273.) This is simply not so.

The majority focuses on evidence in the record that could support a finding of suitability for parole, such as the fact that Roderick has been discipline-free since 1993, the report of J. Steward, Ph.D. (that states that Roderick " 'has attended all of the self help groups available in the prison such as Anger Management and Alcoholics Anonymous' "), and Dr. Hewchuk's indication that Roderick " 'freely admitted to a former problem with alcohol, and has dealt with this issue through membership and attendance at Alcoholics Anonymous meetings.' " (Maj. opn, *ante,* at p. 273.) However, the majority ignores the fact that Roderick's answers to specific questions by the Board about the two significant programs he had attended, Alcoholics Anonymous (AA) and Project CHANGE (a 44-week-long program), were deficient. Roderick was unable to accurately explain the steps of AA,[25] and he was similarly unable to articulate anything additional he learned in the almost year-long Project CHANGE program.[26] Although he attended and "completed" these programs, the inmate apparently had absorbed little, if any,

---

[25] When asked about the steps of AA, Roderick could not articulate what the eighth step was (make a list of all persons harmed and make amends to them), and confused the fourth step (make a searching and fearless moral inventory) with the similar tenth step (continue to take personal inventory and where wrong, promptly admit it). (See *Griffin v. Coughlin* (1996) 88 N.Y.2d 674 [649 N.Y.S.2d 903, 673 N.E.2d 98, 100, fn. 1] [12 steps of AA]; <http://www.alcoholics-anonymous.org/en_information_aa.cfm?PageID+2&SubPage=56> [as of Aug. 17, 2007].)

[26] Apparently the Project CHANGE program was mostly conducted by Roderick himself in his cell, and presumably the "tests" he references taking for the program were self-administered there. This information, however, was supplied in Roderick's testimony at the

useful information from either of them. As the Board pointed out, he certainly did not appear to have learned anything from the programs that would give them any confidence that he would refrain from the use of alcohol in the future, or be able to avoid committing crimes in the future. He could not extrapolate from what he allegedly had learned in the programs to an understanding of why he had committed so many crimes in the past, including the commitment offense.[27] There is thus certainly *some* evidence in the record to support the Board's finding that Roderick's institutional behavior supported a denial of parole. Again, lest we turn deferential review on its head, the fact that there is evidence to the contrary in the record is of no moment. The fact that there may be alternative explanations for Roderick's behavior in the hearing, such as his nervousness, does not negate that evidence; it was the Board's role to judge credibility issues and to resolve such matters.

Additionally, the Board noted that Roderick never obtained his GED or participated in any vocational counseling during his 20-plus years of confinement on the current offense. While it may be argued that he is now too old for either of these failures to really matter in terms of his likelihood to reoffend if released into the community, it nevertheless remains true that he failed to "program" in these areas. Roderick was told by the Board in the past to obtain his GED, and when asked by the Board why he had not done so, his response was typical of his answers as to why he had not "programmed" more: "I don't know either. They never called me to go to school really." Apparently frustrated by Roderick's responses, the Board asked, "You never really tried, did you?" Roderick's response was, "I talked to them a couple of times at Central 13 years ago over here. And when I went over there, I never did talk to them." Roderick's answers would certainly support a conclusion that he never really attempted to obtain a GED, despite being told to do so by the Board on prior occasions. Roderick also never attempted to upgrade vocationally over the more than two decades that he had been in state prison, despite being told to do so by the Board on prior occasions. When asked if there was a reason for this failure, Roderick replied, "No." When the Board noted that he had been "down" for 20 years, Roderick replied, "My age." He claimed that "if you're over 50 they don't want to get you . . . into a place." Given the other failures at effective institutional "programming" detailed above, however, I decline to enter the fray over the issue of whether, and at what point, vocational training became unavailable to Roderick due to his age. In

---

evidentiary hearing on his habeas corpus petition in the trial court, which was improperly admitted. (See discussion, *post*, at pp. 303–305.)

[27] The majority dismisses these legitimate concerns of the Board, stating, "[a]s we have already explained, Roderick's inability to gain or articulate a better understanding of his behavior is a known factor that, according to all reports, does not negatively affect his suitability for parole." (Maj. opn., *ante*, at p. 274.)

Roderick's hearing in 2002, the Board did tell him that he would now just be taking up space in those classes that someone else could more effectively use. The fact remains, however, that Roderick never "programmed" in these areas in more than 20 years of incarceration in state prison, and that he repeatedly ignored specific directions by the Board to do so. If nothing else, these failures to follow the specific directions of the Board over the years may reasonably cause concern about his ability to follow the directives of his parole officer upon his release.

The majority concedes that "[t]he evidence does show that Roderick has a limited capacity either to understand or to explain the mechanisms that led to his criminality. But this limitation is a known quantity and has been factored into his risk assessment." (Maj. opn., *ante*, at p. 271.) While it may be true that some past psychological reports seemed to conclude that Roderick's lack of insight did not affect his risk assessment, I frankly find the conclusion perplexing. The psychological evaluations over the years are inconsistent in their approach to Roderick's lack of insight. In earlier psychological reports (in 1989 and 1992), there was no indication that Roderick was able to articulate any such insight, and these reports reach no conclusions regarding his risk assessment. The 1994 report states, "Inmate Roderick demonstrates little self-understanding about the causative factors regarding this offense or his previous offenses. His only explanation is that he had bad judgment, but he cannot elaborate further about this explanation." The report then indicates, "If he is paroled or released, his violence potential in the past is considered to have been average, and at present is estimated to be decreased." The psychological evaluation for the 1999 hearing indicates that Roderick's psychiatric evaluation "demonstrate[d] little self-understanding about the causative factors regarding [the commitment] offense or his previous of-fenses," and yet jumps to the conclusion that his understanding was somehow appropriate within the "structure" of the offense.[28] This same evaluation indicates that "[t]his inmate had a difficult time understanding the complexity of substance abuse. He was finally able to articulate that, for three years before this life commitment arrest, he had been drinking in such a way that was no longer social."[29] In fact, Roderick's criminal history reflects arrests for driving under the influence and being drunk in public as early as 1967. At least in this one evaluation, however, Roderick was able to draw a connection between his alcoholism and his commission of crimes.

---

[28] Some of the psychological evaluation reports also contain factual inaccuracies. For example, the 1999 report, in its assessment of Roderick's dangerousness, concludes that "Due to several factors including *his complete lack of violent crime* and *his non-existent disciplinary problems since incarceration*, within a controlled prison population, this inmate poses a less than average violence potential." (Italics added.) Roderick in fact had prior disciplinary problems in state prison and several of his prior convictions, as well as the commitment crime, were crimes of violence.

[29] Roderick also admitted that he occasionally used marijuana.

The 2003 report indicates that Roderick "talked openly about the circumstances of the instant offense, and his comments reflect a new sense of insight into his incarceration," without further elaboration.[30] The most recent report, in 2005, does not address this issue at all.[31] Roderick's account of the commitment crime and explanation for his long criminal history has changed little over his years of incarceration. But for the one time when he drew a connection between his use of alcohol and his commission of crimes, there was no explanation as to what had changed to lead the psychological evaluators to conclude either that Roderick had gained such insight, or that it did not matter that he had failed to do so.

The majority describes the Board as becoming antagonistic toward Roderick when he was unable to adequately answer questions about the programs he had participated in. "Moreover, we can discern even on the cold record that the questioning by one Panel member, plainly irritated at Roderick's inability to give the kind of answers he expected to hear, became quite antagonistic. He even criticized Roderick for not attending programs available in the afternoons because he was sleeping, despite the fact that Roderick's job in the canteen required him to begin work at 2:00 a.m. It could not have been surprising that at this point Roderick's responses were more defensive than introspective." (Maj. opn., *ante*, at p. 274.) While I agree with the majority that at times it was clear that the Board members had become frustrated with petitioner, I disagree with its conclusion that it was the fault of the Board members that Roderick was unable to adequately respond to Board members' questions. The interchange cited by the majority to support this position occurs *after* Roderick was unable to give any explanation for his 30-year criminal history (other than it "was stupid"), and *after* he was equally unable to show any insight gained from the programs he participated in that would give the Board members confidence that he would not return to drinking and committing crimes if released. At the point in the record relied upon by the majority, the Board was basically winding up the hearing and giving Board members the opportunity to ask any final questions. One member again questioned Roderick's inability to explain why he had such a lengthy criminal history and commented about his failure to adequately program in prison so as to gain insight into this issue. Much earlier in the hearing, as well as in this concluding portion, the Board expressed its dissatisfaction with Roderick's responses. Just as in *Dannenberg*, "[t]he

[30] Roderick has always seemed more than willing to tell his story about what happened the night of the commitment crime. Why his willingness to do so during this psychological evaluation showed a new insight, however, is never explained.

[31] The 2005 report also contains a factual inaccuracy, as it appears to attribute to the probation department a comment actually made by Roderick, when it states that "[e]ven in the Probation Officer's Report there is a comment about the unfortunate nature that the jury did not find him guilty of a lesser charge, if even any charge were appropriate due to the self defense nature of this altercation."

parole panel's questions to [the prisoner] showed its *reasonable* skepticism" of the prisoner's responses. (*Dannenberg*, *supra*, 34 Cal.4th at p. 1095, italics added.)

The majority finds that there is no evidence to support the Board's determination that Roderick's "programming" was deficient. As indicated by the majority, the record before the Board included Roderick's various explanations for why he was unable to attend programs: because of his work schedule, because of his meal schedule, because of lockdowns, because they did not "call him" to go to school, and because no programs were available. At the hearing before the Board, Roderick was asked why he had not participated in more self-help group programs. At first he responded that "They don't have nothing . . . ." When the Board member pointed out that Roderick had been in prison for 20 years, Roderick reiterated that the prison did not have anything, and added that they were locked up all the time. Upon continued questioning in this area, Roderick stated that for seven years he was getting up at 2:00 a.m. to work in the kitchen, and that he would return to his cell and sleep in the afternoon, rather than attend programs. The Board could reasonably have concluded that Roderick conveniently had many excuses for not "programming."

This case involves the prosecution's appeal from the order of the trial court granting Roderick's writ of habeas corpus. As to this issue regarding the adequacy of Roderick's "programming" in state prison, the trial court conducted an evidentiary hearing on Roderick's petition for habeas corpus relief, and found that the Board's conclusion that Roderick had not sufficiently "programmed" was not supported by the record, after listening to additional testimony from Roderick on this issue. To the extent that an evidentiary hearing is conducted in the trial court on a petition for habeas corpus relief, we are ordinarily bound by the trial court's factual findings if they are supported by substantial evidence.[32]

There were several procedural anomalies regarding the habeas corpus proceeding below. First, the Attorney General was not given notice of the hearing on Roderick's petition for writ of habeas corpus, nor did the trial court initially issue an order to show cause. Only after the Attorney General filed a motion for reconsideration did the trial court permit that office to file a return to the petition. After Roderick's counsel was given the opportunity to file a traverse to this return, the court apparently granted the motion for reconsideration, but refused to vacate its previous order granting the petition

---

[32] The majority does not specifically rely upon this substantial evidence standard of review, but does reference the trial court's findings after conducting the evidentiary hearing, although indicating that they are only reviewing the record before the Board. (Maj. opn., *ante*, at pp. 264–265.)

and instead conducted a hearing. That hearing was not evidentiary and was submitted on the pleadings. The trial court renewed its earlier order granting the writ. Having never received notice of that first hearing where Roderick had testified, the Attorney General was not present and could neither cross-examine Roderick nor present evidence to rebut his claims.

Beyond that, however, the trial court could not properly receive Roderick's testimony at the hearing on the habeas corpus writ. Roderick's testimony did not relate to matters outside the hearing before the Board, and to permit evidence to be given on the same factual issues that were before the Board totally undermines the standard of review that the trial court was required to apply in the habeas corpus proceeding. The trial court should have reviewed the Board's decision under the same "any evidence" standard of review that we are compelled to apply. Under this standard of review, Roderick's proffered testimony was not relevant, and was outside the scope of the habeas corpus proceeding. (See, e.g., *Rosenkrantz, supra*, 29 Cal.4th at pp. 675–676 [evidentiary hearing properly held to add evidence to record regarding Governor's record in overturning Board's decisions in other cases]; *Pope v. Superior Court, supra*, 9 Cal.App.3d at pp. 640–641 [court should not hold " 'evidentiary hearing' " to review on habeas corpus Adult Authority revocation of parole unless record of Adult Authority discloses a distinct reason therefore].) As in *Pope*, an evidentiary hearing may not be held by a court to "redetermine an issue of fact . . . which has been determined upon an adequate record by the Adult Authority." (*Id.* at p. 642.)

Such evidentiary hearings further convert the normal standard of review that we would apply, whether "some evidence" supports the Board's determination, into an inquiry of whether substantial evidence supports the trial court's ruling to the contrary. Allowing the petitioner to augment the record by introducing evidence not before the Board, but relitigating factual issues that were before it, should therefore not be permitted. The trial court improperly expanded the permissible scope of the habeas corpus hearing, and we should not be bound to apply the substantial evidence standard of review to the trial court's finding regarding Roderick's full participation in available programs.

The majority describes the Board's conclusion that there was no indication that Roderick would behave differently if paroled as unsubstantiated speculation and criticizes the Board for using "stock phrases," such as "the prisoner needs to participate in self-help in order to understand and cope with stress in a nondestructive manner." (Maj. opn., *ante*, at p. 260.) The majority states, "This stock phrase was used to deny parole to Roderick four times. Apparently it is also used generically across the state. [Citations.]" (*Id.*, at 248, fn. 14.) No surprise there. Roderick and undoubtedly many, if not most,

prisoners who have committed violent crimes suffer from similar issues. Learning to deal with stress in a nondestructive manner would presumably be the main goal of anger management and other similar classes offered in state prison. Prisoners' failure to obtain this kind of self-help education logically would be a frequent reason for denying parole. As previously discussed (see *ante*, at pp. 282–283), the repetitive use of what the majority refers to as "stock phrases," such as the need to participate in self-help programs or the exact wording found in the governing regulations, is not "rote hyperbole" that is being improperly relied upon by the Board in finding unsuitability for parole.

The majority relies upon Roderick's ability since 1993 to cope with the stresses of prison life in a nondestructive manner, as indicative of his ability to adequately deal with stress without resorting to violence once he is released into the community.[33] While his lack of violent infractions in state prison certainly has some bearing on this issue, it cannot be determinative. Obviously Roderick does not have the same stressors that motivated him to commit crimes in the community impacting him in prison. Further, the very controlled environment of state prison gives him fewer opportunities to act out violently than he will have upon release. Finally, he does not have alcohol readily available to him there. It is this potentially lethal combination of a propensity for violence and alcoholism that is of particular concern in Roderick's case. As the 1994 psychological evaluation stated, "In a less controlled setting, he would be less dangerous if he maintains his sobriety, but that can not be predicted or guaranteed." The most recent psychological evaluation indicates that the one factor that may lead Roderick back to a life of crime is alcohol abuse, stating, "the only significant risk factor to violence would be inmate Roderick using alcohol or drugs . . . ." Even the majority notes that Roderick's criminal history was "fueled by his alcohol abuse." (Maj. opn., *ante*, at p. 277.)[34]

Thus, some evidence supports the Board's determination that Roderick's institutional behavior favored a finding of unsuitability for parole.

---

[33] I note that the court in *Dang v. Ornoski, supra*, 2006 WL 3041096 at p. *7 found that the Board properly relied upon six rule violations (the most recent of which was 10 years prior to the hearing at issue) and minor infractions (the most recent being three years prior to the hearing) as indicating negative institutional behavior. Older transgressions are obviously relevant, and when such violations and infractions become too old to rely upon is not set in stone.

[34] The majority relies upon Roderick's alcoholism being in "remission," as negating concern about his potential for returning to his habit of drinking and engaging in violent conduct. While he may be considered a recovering alcoholic, characterizing Roderick's alcoholism as "in remission" hardly seems appropriate, especially given the lack of local bars or other establishments in state prison where alcohol would be readily available to him.

### (5) *Prior Criminal History*

The majority does concede that which it cannot contest, that there was some evidence in the record to support the Board's reliance upon Roderick's prior criminal history as a circumstance supporting a finding of unsuitability. The majority describes Roderick's criminal history as " 'an extensive criminal history starting in 1952 . . . related to traffic violations, Vehicle Code violations, pretty much continuously, almost without a break until this crime in 1980.' " (Maj. opn., *ante*, at p. 275, quoting from Board's statements.) The majority indicates that his criminal history "over 28 years, including two prior violent crimes," is long and recognizes that "the Panel's finding that Roderick has an extensive criminal history is most certainly supported by the evidence." (Maj. opn., *ante*, at p. 276.) The majority concludes that "[t]he question, however, is whether, on this individualized record, the criminal history constitutes some evidence to support the [Board's] conclusion that Roderick poses an unreasonable risk of danger to the public safety." (Maj. opn., *ante*, at p. 276.)

The limited summary of Roderick's prior record by the majority does not do justice to the weight that could be attached to this circumstance. The Board in its findings refers to Roderick's criminal history starting in 1952 and continuing "pretty much continuously, almost without a break until this crime in 1980." During the hearing, the Board elicited admissions from Roderick that he "had a lot of contact with law enforcement before . . . this offense," that he was "kind of a thug," and that he was "just kind of a career criminal."

As detailed by the Board, Roderick's 30-plus-year criminal history consisted of a very long series of offenses, committed on a regular basis almost without any break other than periods of incarceration, and included many crimes related to substance abuse (such as driving under the influence and being drunk in public). His criminal history also included felony offenses such as burglary, forgery, grand larceny, and grand theft, and included violent crimes such as resisting arrest, two simple assaults, an assault with a deadly weapon, and armed robbery. His criminal history also reflects numerous attempts at community supervision, including grants of probation and parole, and at least one parole violation. Obviously Roderick's criminal history provides more than just *some* evidence supporting this circumstance. Roderick's prior criminal history includes substantial instances of crimes of violence, poor response to community supervision, and prior poor performance on parole, and is indicative of a long and continuous history of substance abuse.[35]

---

[35] While section 2402, subdivision (c)(2) does not specifically reference consideration of a prisoner's nonviolent criminal history, the list of circumstances in that section is nonexclusive and section 2402, subdivision (b) specifically allows the Board to consider a great range of

In the *Fuentes* case, the court upheld the Board's reliance upon the prisoner's past criminal history, even though it lacked any prior violence and was "minimal." The court noted: "It is evident that the Board's concern was not that Fuentes's criminal history was violent or extensive but that it showed Fuentes had been given opportunities to reform his conduct, to deal with his substance abuse, to remain in the Navy, and he had not availed himself of those opportunities but had instead engaged in further criminal conduct. The repetitive and recidivist nature of his conduct—his failure to heed wake-up calls and the opportunities he was given—was a legitimate factor for the Board to weigh in favor of a denial of parole." (*Fuentes, supra,* 135 Cal.App.4th at p. 163.) Here, Roderick's criminal history was both violent and extensive, demonstrating a "repetitive and recidivist" nature, he similarly failed to heed repeated wake-up calls, failed to avail himself of many opportunities to reform his conduct, and repeatedly reoffended despite numerous efforts at community supervision. (See also *Elkins v. Brown, supra,* 2006 WL 3782892 at p. *7) [relatively short criminal history (one adult conviction and no juvenile record) was some evidence to support Board's reliance on this circumstance to find prisoner unsuitable].)

The majority relies upon the *Biggs* case from the Ninth Circuit (*Biggs v. Terhune* (9th Cir. 2003) 334 F.3d 910, 916–917 (*Biggs*)) for the proposition that continued reliance upon immutable factors such as the prisoner's criminal history alone,[36] when the prisoner has continued to demonstrate exemplary behavior and evidence of rehabilitation, may violate due process. First, decisions of intermediate federal appellate courts, while they may be of persuasive value, are not binding on state courts, even when they interpret federal law. (*People v. Zapien* (1993) 4 Cal.4th 929, 989 [17 Cal.Rptr.2d 122, 846 P.2d 704].) Further, as the court indicated in *Hill v. Kane* (N.D.Cal., Oct. 23, 2006 No. C06-3203SIPR) 2006 WL 3020923, the *Biggs* reasoning is not controlling even in federal habeas corpus review of state parole decisions, as it is not based on clearly decided Supreme Court precedent and has not been adopted by the California Supreme Court.[37]

---

"relevant and reliable information," such as the prisoner's " 'past criminal history, including involvement in other criminal misconduct which is reliably documented.' " (*Paluzzi v. Kane, supra,* 2006 WL 3020919 at p. *6; accord, *Elkins v. Brown, supra,* 2006 WL 3782892 at p. *7.)

[36] Although not raised by the majority in its discussion of the commitment crime as a circumstance supporting a determination of unsuitability, that is another "immutable" factor discussed in *Biggs, supra,* 334 F.3d 910 and subsequent cases discussing the issue. The same analysis, *post,* would apply equally to the Board's consideration of the commitment crime.

[37] Federal review on habeas corpus is, of course, limited. As the court explained in *Solis,* "The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: '(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was

Additionally, as explained by Judge Breyer in *Solis, supra*, 2006 WL 2934086, the Ninth Circuit itself appeared to retreat from its *Biggs* position in *Sass v. California Board of Prison Terms* (9th Cir. 2006) 461 F.3d 1123 (*Sass*). "[T]he Ninth Circuit recently made clear that evidence of a prisoner's 'prior offenses and the gravity of his convicted offense []' may 'constitute some evidence to support the [Board of Prison Term's] decision.' *Sass*, slip op. at 10573." (*Solis, supra*, 2006 WL 2934086 at p. *5.) In *Solis*, the continued reliance on the commitment offense and upon the prisoner's prior criminal history (in addition to a recent disciplinary action) was held not to violate due process where the Board gave the petitioner individualized consideration and "some evidence" (*id.* at p. *4) supported its decision, as it simply could not be said that, " 'in making a judgment call based on evidence of pre-conviction recidivism' . . . the [Board] acted 'arbitrarily.' [Citation.]" (*Id.* at p. *5.)

Judge Patel, in *Elkins v. Brown, supra*, 2006 WL 3782892, discusses the impact of *Sass, supra*, 461 F.3d 1123 on *Biggs*, 334 F.3d 910, indicating that the reasoning relied upon by the majority here from the *Biggs* decision was dicta and that "*Sass* . . . determined that the parole board is *not* precluded from relying on unchanging factors such as the circumstances of the commitment offense or the petitioner's pre-offense behavior in determining parole suitability." (*Elkins v. Brown, supra*, at p. *3, italics added.) Judge Patel then seeks to harmonize the two Ninth Circuit opinions, finding that under *Sass*, the Board may look to such immutable factors, but under *Biggs,* the weight to be given to them may decrease over time as a predictor of future dangerousness. (*Elkins, supra*, 2006 WL 3782892 at pp. *3–*4; accord, *Singler v. Schwarzenegger* (N.D.Cal., Apr. 13, 2007, No. C06-373SI) 2007 WL 1031261 at p. *4.)

The Ninth Circuit, however, in the recent case of *Irons v. Carey* (9th Cir., July 13, 2007, No. 05-15275) 2007 WL 2027359 (*Irons*), arguably attempted to breathe some new life into the *Biggs* reasoning (*Biggs, supra*, 334 F.3d 910) by suggesting that an inmate's imprisonment beyond the minimum number of years required by his sentence might be the point at which reliance upon the immutable factor of the circumstance of the commitment offense might cause due process concerns. The court in *Irons*, like the court in *Biggs*, upheld the finding of unsuitability for parole and then mused again about the potential that "at some point" and "in some cases" the indefinite retention of a prisoner, regardless of rehabilitation, might violate due process. However, this reasoning, like that in *Biggs*, was merely dicta. As the court stated, "We note that in all the cases in which we have held that a parole board's decision

---

based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. [Citation.]' " (*Solis, supra*, 2006 WL 2934086 at p. *1.)

to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence . . . . All we held in those cases and all we hold today, therefore, is that, given the particular circumstances of the offenses in these cases, due process was not violated when these prisoners were deemed unsuitable for parole prior to the expiration of their minimum terms." (*Irons, supra*, 2007 WL 2027359 at p. *6.)

In *Singler v. Schwarzenegger, supra*, 2007 WL 1031261, District Judge Illston examined the Ninth Circuit decisions in *Biggs, supra*, 334 F.3d 910, *Sass, supra*, 461 F.3d 1123, and *Irons, supra*, 2007 WL 2027359, and concluded, "Interpreting this statement from *Irons* to suggest that the offense can only be relied on until the minimum number of years has been reached would suffer the same problem that *Sass* identified in *Biggs*: it is not the holding of the case. The dicta in *Biggs* and *Irons* are speculative and do not determine when a denial of parole based solely upon the commitment offense or pre-offense behavior violates due process. Neither logic nor *Irons* compel a decision that such reliance must cease when the prisoner reaches the minimum number of years in his sentence, such as the fifteenth year of a 15-to-life sentence." (*Singler v. Schwarzenegger, supra*, 2007 WL 1031261 at p. *3.) Further, as Judge Illston concludes, "Past criminal conduct is not some arbitrary factor like eye color that has nothing to do with present dangerousness. Recidivism concerns are genuine. See *Ewing v. California*[(2003)] 538 U.S. 11, 26 [155 L.Ed.2d 108, 123 S.Ct. 1179] (O'Connor, J.) (noting a report stating that over 60% of violent offenders were arrested again within three years of their release). California's parole scheme does not offend due process by allowing the [Board] to predict that an inmate presents a present danger based on a murder he committed many years ago." (*Id.* at p. *4.)

There is no magical point at which reliance upon immutable factors such as the commitment offense or prior record of the prisoner, even alone, necessarily becomes a due process violation. Indeed the most egregious of commitment crimes, or the most severe criminal history, may carry sufficient weight to justify retention of a life prisoner long beyond his minimum years of incarceration. If these three cases from the Ninth Circuit mean anything, it is only that the nature of the commitment crime and the prisoner's criminal history may be relied upon by the Board in determining that he is not suitable for parole, but the weight to be attributed to such "immutable" factors *may* decrease over time, if they are relied upon alone to determine unsuitability, once the prisoner has served his minimum sentence. (See *Singler v. Schwarzenegger, supra*, 2007 WL 1031261 at p. *4.) Thus, even if we were bound by the musings of the Ninth Circuit in dicta, when determining the predictive value of such an immutable circumstance the particular facts of the circumstance and its age would logically be considered. (See, e.g., *Lawrence,*

*supra*, 150 Cal.App.4th at p. 1540; *Elkins v. Brown, supra*, 2006 WL 3782892 at p. *3.) The determination of the weight to be attached to these circumstances would always rest, of course, with the Board.

Roderick's criminal history is long, his prior convictions frequent, sometimes serious, and often violent. His crimes reflect both an addiction to alcohol and a tendency toward violence, and he has previously failed under community supervision. This record alone would justify his retention for a substantial period of time beyond that for other prisoners convicted of similar crimes, if that were the standard. Under the facts of this case, we have not reached the point where relying upon this immutable factor alone, had the Board done so, would constitute a violation of due process (if it ever would), because it had lost all its predictive value. In the present case, however, we need not reach that issue, as the Board did not rely upon the immutable factor of the prisoner's prior criminal history *without regard to intervening factors.* Most significant of those intervening factors were Roderick's failure to successfully program in state prison and his attitude toward the crime. By his testimony at the hearing, Roderick demonstrated that he has little, if any, insight into why he committed so many crimes in the past, why he committed the commitment crime, or his alcoholism. As the Board explained, he did not evoke confidence that he would not return to a life of drinking and violence if released into the community.

The record reflects that the Board engaged in an individualized evaluation of Roderick's suitability for parole, and the majority does not contend otherwise. The only circumstance not considered specifically by the Board, which might have tended to show suitability for parole, was the lack of any evidence that Roderick had a juvenile record. However, as the majority notes, Roderick indicated in one early psychological evaluation that he had been committed to the youth authority at the age of 14. The majority surmises that this must have been an isolated incident, as there is no record of any juvenile arrests in Roderick's file. (Maj. opn., *ante*, at p. 268, fn. 21.) While it is true that the prisoner's criminal record (as set forth in the probation report and in the reports from the California Department of Corrections) does not even reflect this lone juvenile offense that Roderick admitted to, that absence of information does not necessarily support the majority's conclusion. Rather than speculating that it was an isolated incident, one might more reasonably surmise that either Roderick's juvenile record was extensive, or that the underlying offense was quite serious, if it resulted in a youth authority commitment at the young age of 14.[38]

---

[38] Apparently Roderick was still residing in the State of Washington at the time of this youth authority commitment. Most of his juvenile history would have been from the 1940's and it is questionable how accurately the manual portion of his rap sheet would reflect even adult nonautomated criminal history of that vintage, much less out-of-state juvenile adjudications.

Finally, the majority concludes that there is no evidence in the record that supports the Board's conclusion that releasing Roderick at this time would pose an unreasonable danger to the public. The majority, relying upon *In re Lee* (2006) 143 Cal.App.4th 1400, 1408 [49 Cal.Rptr.3d 931] and *Scott II, supra,* 133 Cal.App.4th at page 595, takes the position that the proper analysis on review of the Board's finding of unsuitability is whether any evidence supports the ultimate decision of the Board, that the prisoner's release would unreasonably endanger public safety. As the majority states, "it is not enough that there is some evidence to support the factors cited for denial; that evidence must also rationally support the core determination required by the statute before parole can be denied, i.e., that a prisoner's release will unreasonably endanger public safety." (Maj. opn., *ante,* at p. 263.) It is not settled, however, that this is the correct analysis. There is disagreement as to whether a reviewing court should determine if some evidence supports the circumstances cited by the Board in finding the prisoner unsuitable for parole, or if the correct test is whether some evidence supports the Board's overall determination that the prisoner is unsuitable for parole because his release unreasonably endangers public safety.

The majority in the recent *Lawrence* case also agrees with the court's analysis in *In re Lee, supra,* 143 Cal.App.4th 1400. (*Lawrence, supra,* 150 Cal.App.4th 1511.) Presiding Justice Perluss, however, in his dissent in *Lawrence,* articulates why this "recasting of the some-evidence standard," while it may be appealing to a reviewing court's sense of justice in a particular case, is at odds with *Rosenkrantz, supra,* 29 Cal.4th 616. So long as some evidence supports the factor(s) relied upon by the Board, the only way to determine that the Board's decision to deny parole is not supported by some evidence is for the reviewing court to decide "the probative (or predicative) value of that factor is outweighed by other indicia of suitability." (*Lawrence, supra,* 150 Cal.App.4th at p. 1570 (dis. opn. of Perluss, P. J.).) Although discussed in the context of the review of the Governor's determination to override the Board's decision to grant parole, the same standard attaches to judicial review of the Board's determination. Our review is limited to determining whether some evidence supports the Board's finding that each circumstance, relied upon in finding the prisoner unsuitable for parole, exists. The regulations indicate that these circumstances *do* tend to show unsuitability for parole (see § 2402, subd. (c)), and the manner in which these factors are considered and balanced, and the weight to be attached to each, lies within the discretion of the Board. (*Rosenkrantz, supra,* 29 Cal.4th at p. 677.) So long as the Board's reliance upon them is supported by some evidence, so is the Board's determination that the prisoner is unsuitable for parole. As the court summarized its decision in *Rosenkrantz,* "[U]nder this

standard a court is authorized to review the factual basis of the [Board's] decision *only to determine whether it is supported by some evidence relevant to the factors the [Board] is required to consider . . . .*" (*Id.* at p. 626, italics added.) The court further elaborated that "[i]f the decision's consideration *of the specified factors is not supported by some evidence* in the record and thus is devoid of a factual basis the court should grant the prisoner's petition . . . ." (*Id.* at p. 658, italics added.) I agree with Presiding Justice Perluss that, as tempting as it may be in order to satisfy our individual sense of justice and to support our personal opinion regarding whether a particular prisoner is suitable for parole, we cannot subvert the very deferential standard of review in this manner.

*Conclusion*

As is evident from the areas of disagreement between the majority and dissent in the present case, the process of evaluation of the circumstances to be considered by the Board in determining whether a life prisoner is suitable for parole involves subjective judgment calls. This is to be expected, since the Board is ultimately trying to predict future dangerousness, which is by nature a subjective analysis. (See *Sturm, supra*, 11 Cal.3d at p. 266.) I believe we should ordinarily defer to the Board in the judgment calls it makes regarding these circumstances; after all, Board members have both training and vast experience in this field. They conduct literally thousands of parole suitability hearings each year.[39] The Board therefore has the opportunity to evaluate the egregiousness of the facts of a great number of commitment offenses. It evaluates participation in, and successful completion of, programs for a great number of prisoners. Board members listen to the testimony of a multitude of inmates, and assess their attitudes toward their criminal histories, toward their commitment crimes, toward their "programming," and toward the Board. The Board's experience and training in evaluating these circumstances far exceed that of most, if not all, judges. So long as there is any evidence in the record to support the circumstances the Board relies upon in making its determination of unsuitability, its decision should be given the deference mandated by the decisional law of the United States Supreme Court and the California Supreme Court. (See *Superintendent v. Hill, supra*, 472 U.S. at pp. 455–456; *Dannenberg, supra*, 34 Cal.4th at pp. 1095–1096, fn. 16; *Rosenkrantz, supra*, 29 Cal.4th at pp. 677–679.)

---

[39] See *Board of Prison Terms v. Superior Court* (2005) 130 Cal.App.4th 1212, 1240 [31 Cal.Rptr.3d 70] (several thousand parole suitability hearings were held in 2003); <http://www.cdcr.ca.gov/ReportsResearch/caseload_stats.html> (as of Aug. 17, 2007).

There is evidence in the record that supports the circumstances relied upon by the Board in finding Roderick unsuitable for parole. This is all that is required, and the Board's determination of unsuitability should be upheld. The trial court's order granting Roderick's writ of habeas corpus should be reversed.[40]

A petition for a rehearing was denied September 12, 2007, and the opinion was modified to read as printed above.

---

[40] The particular facts of the present case, and some other recent cases stretching the deferential standard of review in the parole suitability context, may not be so egregious as to call for attention from our high court. However, the slow yet steady erosion of the deferential standard of review as demonstrated by these decisions indicates the need for intervention. This erosion includes the subtle manipulation of the elements of that standard of review, as discussed by Presiding Justice Perluss in his dissent to the *Lawrence* case (*Lawrence, supra,* 150 Cal.App.4th 1511), along with a continuation of comparative analysis with other similar crimes despite what appears to be a clear statement of the proper analysis in *Rosenkrantz, supra,* 29 Cal.4th 616, and *Dannenberg, supra,* 34 Cal.4th 1061 (comparing the commitment crime to the minimum elements required for the offense). Finally, the contortion of the deferential standard of review, both in the trial court and upon appellate review, by the mechanism of conducting an evidentiary hearing in trial court habeas corpus proceedings on the very factual issues that were heard and determined by the Board, is also troubling. Clarification of these legal issues, and a strong statement of the appropriate application of the deferential standard of review, would clarify the law in these areas, and hopefully prevent the continued erosion of that standard.